# EXHIBIT A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

AMAZON.COM, INC.,

Plaintiff,

v.

ARTHUR VALDEZ,

Defendant.

CASE NO.

COMPLAINT FOR INJUNCTIVE AND
OTHER RELIEF

Plaintiff Amazon.com, Inc. ("Amazon") for a complaint against Arthur Valdez alleges as follows:

## I.    INTRODUCTION

1.    Amazon brings this action to prevent its former senior supply chain and logistics operations leader, Arthur Valdez, from leveraging his position and confidential strategic knowledge at Amazon to take a directly competitive position in charge of leading all supply chain operations at Target Corporation.  Mr. Valdez's new position with a key Amazon competitor will involve the disclosure and use of Amazon's confidential and proprietary information to Amazon's detriment and Target's advantage in a core area of competition between the companies:  the cost-effective and rapid movement of goods in the most efficient way possible for retail customers.  Mr. Valdez's employment by Target will breach his agreement not to engage in such direct and harmful competition against Amazon for a limited time following the termination of his employment with

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF - 1

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

4847-2581-5342

Amazon, will violate the Washington Trade Secrets Act, and will violate Mr. Valdez's duty of loyalty to Amazon.

2.     Mr. Valdez has worked in Amazon's supply chain operations for 16 years, rising through the ranks at Amazon from his first position as manager of a fulfillment center to spend years at the company as a leader in developing and operating one of Amazon's primary competitive advantages:  its confidential systems and approaches to managing one of the most competitive retail supply chains in the world.  Since 2009, Amazon has entrusted Mr. Valdez with various senior leadership positions at Amazon, including as:  Vice President in charge of Amazon's United Kingdom operations, Vice President of North America Supply Chain and Transportation Operations, Vice President of Amazon's World Wide Last Mile, Vice President of Amazon Logistics and, most recently, Vice President of Operations North America working on leveraging and deploying Amazon's confidential supply chain advantages in emerging markets (*e.g.*, Mexico, Canada, and Brazil).  In these roles Mr. Valdez was not only privy to Amazon's most confidential strategy, implementation plans, and operational techniques, which are the foundation of Amazon's position as the market leader in supply chain and logistics, but he also helped develop them.

3.     Mr. Valdez most recently reaffirmed Amazon's  Confidentiality, Noncompetition and Invention Assignment Agreement ("Noncompetition Agreement") on June 18, 2012, a true and correct copy of which is attached hereto as **Exhibit A** and incorporated herein by this reference**.** This Noncompetition Agreement affirmed and was identical to the Noncompetition Agreement he signed in 1999 when he first came to Amazon.  In those Noncompetition Agreements, Mr. Valdez promised to abide by a limited "time out" on employment with Amazon competitors and to abide by standard nondisclosure restrictions.  These narrow restrictions are intended to protect against circumstances exactly like this one, where a senior executive at Amazon would otherwise take Amazon's training and expertise underlying its competitive advantages, along with Amazon's confidential information, strategy and trade secrets, to a competitor, to Amazon's detriment.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF - 2

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

4847-2581-5342

4.      When Mr. Valdez announced his departure for Target, he told Amazon that his work for Target would not violate the Noncompetition Agreement because he would be focused on delivering product to stores.  This description was itself competitive with Amazon.  It also failed to accurately describe his role at Target.  Target's own pronouncements contradicted Mr. Valdez's representations.  For example, in Target's press release announcing Mr. Valdez's hire, Target stated that Mr. Valdez would be Target's Executive Vice President, Chief Supply Chain and Logistics Officer leading "Target's supply chain transformation including planning, distribution and transportation" and reporting directly to Target's Chief Operating Officer ("COO").  A true and correct copy of Target's press release regarding Mr. Valdez is attached as **Exhibit B** and incorporated herein by this reference**.**  Target's press release acknowledged that Mr. Valdez worked in each of these areas at Amazon to drive Amazon's confidential and proprietary processes and practices that support Amazon's industry leading performance in these categories.  Target lauded Mr. Valdez's "leadership positions across [Amazon's] global and domestic supply chain, including transportation, fulfillment and logistics."  Target's press release made it clear that Target and Mr. Valdez intended to use his Amazon training and experience and that its growth "hinges on [Target's] ability to enhance the fundamental aspects of our business, starting with the supply chain."  Target declared that it considered Mr. Valdez's "leadership and experience [at Amazon] . . . a tremendous asset . . . to drive improvements in end-to-end processes. . . ."

5.      Mr. Valdez's resume for Target illustrates how he shopped to Target the very high-level knowledge he had gained from "[p]articipat[ing] in strategic planning with other senior leaders at Amazon across multiple entities, including retail, IT, web services, supply chain, finance, and transportation."  Similarly, his resume promoted his "recent roles with Amazon, determin[ing] strategy for topology of operational locations, capital assessment, management requirements, engineering design, capacity management, financial management, and P&L oversight as it relates to entire Amazon operation."

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF - 3

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax:  (206) 676-7001

4847-2581-5342

6.      While interviewing with Target's most senior executives, Mr. Valdez referenced not only core aspects of Amazon's confidential information, training and expertise, but also the title and topics of a key analysis and strategy meeting Mr. Valdez was contributing to and participating in at Amazon.  Mr. Valdez's behavior at Target with respect to Amazon's confidential information before being hired there highlights the injury to Amazon from Mr. Valdez's work for Target if he works there.

7.      Target provided a detailed report on the status of its business to its shareholders on March 2, 2016.  A true and correct copy of the transcript of Target's shareholder meeting, downloaded from Target's website, is attached as **Exhibit C** and incorporated herein by this reference.  Target announced to investors that its goal for the future was "modernizing supply chain."  *Id.* at 4.  Target emphasized its plan to bring in "world-class experts in . . . supply chain."  *Id.* at 3.  The company's CEO recognized that Target's "future depends on getting the fundamentals right.  And that means modernizing supply chain.  It means enhancing our technology, taking complexity out of our systems, [and] elevating the use of data. . . ."  *Id.* at 4.  Target's COO acknowledged the inadequacy of the company's supply chain.

> [W]e've been adding stress and complexity to systems that frankly were built for another time to keep pace with our changing guests, to consistently deliver what our guests expect and position Target for the future, we must zero in on critical pieces—supply chain, stores, technology. . . .  For 50 years, we were working off a pretty linear system.  It started by moving product from our vendor partners into distribution centers and then out to our stores. . . .   Today, the world couldn't be more different. . . .  We continue to send product to stores to support an in-store shopping experience.  But we are also shipping directly to guests from stores, [distribution centers], even vendors and we are sending products to stores for online order pickup.

*Id.* at 9.  He emphasized that Target needs to learn how to run an e-commerce supply chain and

> optimize how we forecast, allocate and replenish products across our supply chain.  Years ago, we knew exactly how to plan for in-store demand and move product to the right store at the right time.  As we've started to use our network in many different ways, fulfilling guest orders that come from a variety of channels, we've needed to improve how we plan and move product so that it's ready as soon as the guest needs

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF - 4

Summit Law Group PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

4847-2581-5342

1    it.  Nailing this core part of our supply chain operation will unlock incredible growth
     potential.

2    *Id.* at 11.

3       8.     Target's COO noted that Target's customers "can still shop our stores to get the

4    products they need. . . .  But they can also shop online and have the order delivered to their home or

5    . . . they can order online and pick up in store. . . ."  *Id.* at 9.  This description effectively

6    encompasses the very customers for which Amazon and Target compete and acknowledges the

7    reality that the company which does a better job through its supply chain of making products

8    available faster and more conveniently has a competitive advantage with those customers.

9       9.     To lead this effort, Target's COO announced to Target's shareholders that the

10   company had found

11       a new leader of our global supply chain operation who will bring proven experience
         and fresh thinking to help build on our progress.  Arthur Valdez will join our team
12       later this month as EVP and Chief Supply Chain and Logistics Officer.  He has spent
         his more than 20-year career in operations for a variety of brands and products, but
13       **comes to us most recently from Amazon where he led the company's
         international supply chain expansion and worldwide logistics function.  Based
14       on his background and my conversations with Arthur, there's no better way to
         describe him than a creative supply chain strategist.  He has designed efficient,
15       cost-effective and fast operations and developed innovative ways to move
         product closer to the consumer.  His expertise and proven track record have
16       signaled that he's the right person to help move Target forward. . . .**
17

18   *Id.* at 11 (emphasis added.)  Target has written into the public record its plan to specifically leverage

19   Mr. Valdez's 16 years of experience developing Amazon's supply chain, including many years

20   developing and implementing the key confidential metrics, practices and strategies which have

21   made Amazon the leader in supply chain performance, to Target's advantage in competing against

22   Amazon.

23      10.    Amazon reached out to Target and Mr. Valdez's personal lawyer to try to negotiate a

24   resolution to this critical violation of Mr. Valdez's Noncompetition Agreement and to address

25   Amazon's concerns that Mr. Valdez would be unable to refrain from using his knowledge of

26   confidential Amazon performance strategies and trade secrets as the executive responsible for

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF - 5

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

4847-2581-5342

improving Target's performance in the very same areas he managed directly and participated in as part of the Amazon executive team.  The parties were unable to do so.

11.     Mr. Valdez's employment by Target to lead its supply chain, or in any other capacity supporting Target's supply chain and transportation operations, will necessarily involve direct and indirect competition with Amazon for Amazon's existing or prospective customers, target markets, and/or business partners, and will therefore breach the Noncompetition Agreement and result in the disclosure of Amazon's highly confidential information and trade secrets.  Mr. Valdez cannot lead Target's supply chain operations without referencing confidential information learned and developed by him at Amazon to drive superior performance in exactly the same areas.

12.     Amazon asks this Court to enforce the terms of Mr. Valdez's Noncompetition Agreement, by enjoining Mr. Valdez from working in Target's supply chain operations during the 18-month noncompetition period.

## II.   PARTIES

13.     Plaintiff Amazon is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Seattle, Washington.  It is the world's most widely-recognized online retailer and a world leader in bringing a vast array of retail products quickly and efficiently to its customers' front doors.

14.     Defendant Arthur Valdez is a former Amazon senior executive and was at all times relevant to this Complaint a resident of King County, Washington.  On information and belief, Mr. Valdez currently resides in King County, Washington.  On information and belief, Mr. Valdez is not on active military duty and is not entitled to protection under the Servicemembers Civil Relief Act.

## III.   JURISDICTION AND VENUE

15.     This Court has jurisdiction over Defendant Valdez and the subject matter of this action because Mr. Valdez entered into the Noncompetition Agreements in Washington, he is (or was at relevant times) a resident of this State, he transacted business in Seattle, Washington, he

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF - 6

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

4847-2581-5342

performed his contract with Amazon in Washington, and he expressly consented to the jurisdiction of this Court in the Noncompetition Agreement.

16.    Venue properly lies in King County because a substantial part of the events giving rise to this lawsuit occurred in King County, Mr. Valdez resides in King County, and the express terms of his Noncompetition Agreement provide that venue for any action brought to enforce that agreement shall be in King County, Washington.

### IV.  FACTS

**A.    Mr. Valdez Agreed to the Noncompetition Agreement as a Condition of Employment With Amazon.**

17.    Mr. Valdez has been bound by the same terms of Amazon's Noncompetition Agreement throughout his 16-year tenure at Amazon.  Most recently, on June 18, 2012, as a "condition of . . . employment" as Amazon's Vice-President of North America Supply Chain and Transportation Operations, Mr. Valdez reaffirmed those terms.  *See* **Exhibit A.**  Among other things, the Noncompetition Agreement contains both a confidentiality provision protecting Amazon's trade secrets and sensitive business information and a limited noncompetition provision.

18.    Section 2(a) of the Noncompetition Agreement emphasized that, to do his job at Amazon, Mr. Valdez would need to have access to Amazon's valuable confidential information. Specifically, it stated that:

> The parties acknowledge that, in order to permit [Valdez] to successfully perform and/or continue to perform the duties associated with [Valdez's] employment with the Company, it is necessary for the Company to provide [Valdez] with access to certain valuable proprietary information and knowledge of certain modes of business operation ("Confidential Information") which are essential to the effective operation of the Company, and which give the Company a competitive advantage over other firms pursuing related business activities.

19.    Mr. Valdez further acknowledged that he would create and be exposed to Amazon's Confidential Information and that he was restricted from misusing it during or after employment. Section 2(b)(i) of the Noncompetition Agreement provides, in relevant part:

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF - 7

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

[Valdez] acknowledges that he . . . has acquired and/or will acquire Confidential Information in the course of or incident to [Valdez's] employment with [Amazon], and that [Amazon's] . . . business could be seriously jeopardized if such Confidential Information were to be used by [Valdez] or by other persons or firms to compete with [Amazon]. Accordingly, [Valdez] agrees that he . . . shall not, directly or indirectly, at any time, during the term of his . . . employment with [Amazon] or at any time thereafter, and without regard to when or for what reason, if any, such employment shall terminate, use or cause to be used any such Confidential Information in connection with any activity or business except the business of [Amazon] and shall not disclose such Confidential Information to any individual, partnership, corporation, or other entity. . . .

20.     The Noncompetition Agreement explained that Amazon's Confidential Information takes a variety of forms.  Section 2(a) defines Confidential Information to include:

(i)      the identity of [Amazon's] business partners, customers, investors, or joint venturers, vendors, or suppliers;

(ii)      computer software developed by [Amazon];

(iii)      data of any sort compiled by [Amazon], including, but not limited to, data on the effectiveness of any particular marketing campaign or advertising venue or method, or demographic or other data related to [Amazon's] customers or prospective customers;

(iv)      the fact that [Amazon] uses, has used, or has evaluated for potential use a particular computer program or system, or any particular database or source of data, supplied by a party other than [Amazon];

(v)      algorithms, procedures or techniques, or the essential ideas and principles underlying such algorithms, procedures or techniques, developed by, or whose workings are otherwise known to, [Amazon] (but excluding any public domain algorithms, procedures, or techniques, and excluding any algorithms, procedures, or. techniques licensed by [Amazon] from a third party on a non-exclusive basis), whether or not such algorithms, procedures or techniques are embodied in a computer program, including, but not limited to, techniques for identifying prospective customers, communicating effectively with prospective or current customers, reducing operating costs, or increasing system reliability;

(vi)      the fact that [Amazon] uses, has used, or has evaluated for potential use any particular algorithm, procedure or technique, or the essential ideas and principles underlying such algorithm, procedure or technique, developed by a party other than [Amazon] (including any algorithms, procedures or techniques in the public domain), whether or not such algorithms, procedures or techniques are embodied in a computer program;

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF - 8

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

4847-2581-5342

(vii)    pricing or marketing strategies developed, investigated, acquired, evaluated, modified, tested or employed by [Amazon], or any information related to, or that might reasonably be expected to lead to, the development of such strategies;

(viii)   information about [Amazon's] future plans, including, but not limited to, plans for expanding into new products or services;

(ix)    any information that would typically be included in [Amazon's] financial statements, including, but not limited to, the amount of [Amazon's] assets, liabilities, net worth, revenues, expenses, or net income;

(x)    information related to, or that might reasonably be expected to lead to, understanding the viability of selling any particular product or service via any particular vehicle such as interactive, computer-based shopping;

(xi)    any other information gained in the course of [Valdez]'s employment with [Amazon] that could reasonably be expected to prove deleterious to [Amazon] if disclosed to third parties, including without limitation any information that could reasonably be expected to aid a competitor or potential competitor of [Amazon] (a "Competitor") in making inferences regarding the nature of [Amazon]'s business activities, where such inferences could reasonably be expected to allow such a Competitor to compete more effectively with [Amazon].

21.    Mr. Valdez also agreed to an 18-month noncompetition restriction in the Noncompetition Agreement, running from the termination of his employment.  That covenant, set forth in Section 3(c) of the Noncompetition Agreement, provides, in relevant part:

(c)    While employed by [Amazon] and for a period of 18 months after the date [Valdez] ceases to be employed by [Amazon], without regard to when or for what reason, if any, such employment shall terminate, [Valdez] will not, directly or indirectly, and whether or not for compensation, either on his or her own behalf or as an employee, officer, agent, consultant, director, owner, partner, joint venturer, shareholder, investor, or in any other capacity (except in the capacity of an employee of [Amazon] acting for the benefit of [Amazon]), knowingly:

(ii)    accept or solicit employment with, or accept or solicit a consulting assignment with, or accept or solicit business from any individual or entity that was a customer or client of [Amazon] prior to the Termination Date, or with which [Amazon] had engaged in serious discussions prior to the Termination Date related to the possibility that such individual or entity might become a customer or client of [Amazon] (a "Current or Prospective Customer"), if the product or service provided by [Valdez] to such Current or Prospective Customer is substantially the same as a product or service offered by [Amazon] to such Current or Prospective Customer, and such acceptance or solicitation would be competitive with or

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF - 9

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

4847-2581-5342

otherwise deleterious to [Amazon]'s own business relationship or anticipated business relationship with such Current or Prospective Customer; or

(iii)   accept or solicit business from any retail market sector, segment, or group that [Amazon] has solicited, targeted, or accepted business from prior to the Termination Date, or has actively planned, prior to the Termination Date, to solicit, target, or accept business from (the "Target Market"), if the product or service provided or offered by [Valdez] to such Target Market is substantially the same as a product or service provided or offered by [Amazon] to the Target Market, and such acceptance or solicitation would be competitive with or otherwise deleterious to [Amazon's] own business activities, or anticipated business activities, related to the Target Market; or

(iv)   enter into or propose to enter into any business arrangement with any entity with which, prior to the Termination Date, [Amazon] was involved in substantially the same business arrangement, or with which, prior to the Termination Date, [Amazon] had held discussions regarding the possibility of entering into such an arrangement, if such arrangement would be competitive with or otherwise deleterious to the interests of [Amazon].

22.     In Section 4(a) of the Noncompetition Agreement, Amazon emphasized and Mr. Valdez acknowledged, that the Noncompetition Agreement could "seriously limit [his] future flexibility in many ways," and specified, as an example, that Section 3 "will make it impossible for [him] to seek or accept certain opportunities for a period of 18 months after the Termination Date, despite the fact that such opportunities might be highly attractive to [him] and provide greater compensation than any other available opportunities. . . ."

23.     Mr. Valdez further acknowledged in Section 4(a) of his Noncompetition Agreement that the restrictions in Sections 2 and 3 were "reasonable in view of the nature of the business in which [Amazon] is engaged, [his] position with [Amazon], and [his] knowledge of [Amazon's] business." He agreed that his "compensation (cash, equity, and otherwise)," over $1 million in 2015 alone, reflected his agreement to the confidentiality and noncompetition provisions of the Noncompetition Agreement and that Mr. Valdez would "not be subject to undue hardship by reason of [his] agreement to" the confidentiality and noncompetition obligations.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF - 10

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

4847-2581-5342

1    24.    Mr. Valdez agreed that injunctive relief was appropriate to enforce the

2  Noncompetition Agreement and prevent irreparable harm to Amazon.  Section 6 of the

3  Noncompetition Agreement provides, in relevant part:

> [Valdez] acknowledges that any breach of this Agreement may cause [Amazon]
> irreparable harm for which there is no adequate remedy at law, and as a result of this,
> [Amazon] shall be entitled to the issuance by a court of competent jurisdiction of an
> injunction, restraining order, or other equitable relief in favor of itself, without the
> necessity of posting a bond, restraining [Valdez] from committing or continuing to
> commit any such violation.  Any right to obtain an injunction, restraining order, or
> other equitable relief hereunder shall not be deemed a waiver of any right to assert
> any other remedy [Amazon] may have at law or in equity.

**B.    Overview of Supply Chain Competition Between Amazon and Target.**

25.    Amazon and Target directly compete for retail customers via their supply chains.
Amazon was and is a pioneer in supply chain and logistics management and Target is a key
competitor.

26.    In its most recent Annual Report, Target pointed out the risks it faced if the company
is not able to create an effective e-commerce supply chain to satisfy savvy, online consumers.

> [Target's] business has evolved from an in-store experience to interaction with guests
> across multiple channels. . . .  Omnichannel[1] retailing is rapidly evolving and we
> must anticipate and meet changing guest expectations and counteract new
> developments and technology investments by our competitors.   [Target's]
> omnichannel retailing efforts include implementing new technology, software and
> processes to be able to fulfill guest orders from any point within our system of stores
> and distribution centers, which is extremely complex and may not meet guest
> expectations for timely and accurate deliveries. If [Target is] unable to attract and
> retain team members or contract with third parties having the specialized skills
> needed to support [its] omnichannel efforts, . . . allow real-time and accurate visibility
> to product availability when guests are ready to purchase, quickly and efficiently
> fulfill [its] guests orders . . . , [its] ability to compete and [its] results of operations
> could be adversely affected.

---

[1] "Omnichannel" retailing "integrates the different methods of shopping available to consumers (*e.g.*, online, in a
physical store, or by phone)."  http://www.oxforddictionaries.com/us/definition/american_english/omnichannel.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF - 11

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

4847-2581-5342

https://corporate.target.com/_media/TargetCorp/annualreports/2014/pdf/Target-2014-Annual-Report.pdf?ext=.pdf.  Thus, what Target needs from its supply chain is precisely what Amazon has achieved with its supply chain.

27.      Target acknowledges that "[t]he retail business is highly competitive."  This is all the more so in the online retail market it has more recently entered.  Target concedes:

> The continuing migration and evolution of retailing to online and mobile channels has increased our challenges in differentiating ourselves from other retailers.  In particular, consumers are able to quickly and conveniently comparison shop and determine real-time product availability using digital tools, which can lead to decisions based solely on price, the functionality of the digital tools or a combination of those and other factors.

Target compares its shareholder returns to those of its "Peer Group" which includes Amazon.  The "Peer Group" materially outperforms Target.

https://corporate.target.com/_media/TargetCorp/annualreports/2014/pdf/Target-2014-Annual-Report.pdf?ext=.pdf.

28.      In its March 2, 2016 investor meeting, Target acknowledged that it has an antiquated supply chain which is not up to the task of serving online customers.  *See* **Exhibit C.**  Target cheered its hiring of Mr. Valdez as a world-class supply chain expert trained by Amazon.  Target recognized that Mr. Valdez's knowledge of Target's supply chain would be directly applicable to the manner in which Target fulfills and delivers retail goods to its customers.

29.      Amazon and Target compete directly with respect to efficient delivery to customers shopping on their e-commerce sites and elsewhere.  Between Amazon and Target, the more varied a retail product that can be delivered, the faster and more efficient the delivery of that retail product, and the better managed cost structures that can be achieved internally, the better either Amazon or Target is positioned against each other in their competition for customers.

30.      Target and Amazon's supply chain and logistics competition is not limited to e-commerce.  They compete in every area of their delivery of goods to customers.  For example, Target seeks to set up its stores as places where customers can not only shop, but also pick up items

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF - 12

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

4847-2581-5342

1   ordered online, or as fulfillment centers from which product is sent out for delivery to customers'

2   homes.  Target's supply chain must service all of these interactive elements at the same time.  This

3   is the same supply chain challenge as that faced by Amazon.  Amazon's supply chain connects

4   direct delivery to e-commerce customers at their homes, like Target, and also delivers to fulfilment

5   centers and drop-off locations, functionally similar to Target's stores.  Target's and Amazon's

6   supply chains attack the same challenge:  managing and improving the efficient and cost-effective

7   delivery of the widest possibly array of retail goods to customers anywhere those customers want to

8   pick up or receive their purchases.

9   **C.    Because Amazon Employed Mr. Valdez, He Acquired Extensive, In-Depth, Highly
        Confidential Amazon Information and Trade Secrets About Amazon's Supply Chain,**

10  **    Including Transportation, Fulfillment and Logistics.**

11          31.    As a high ranking executive running critical operations within Amazon's supply

12  chain and thus as a part of Amazon's exclusive Operational Leadership Team ("OLT"), Mr. Valdez

13  knows, created, and implemented Amazon's most confidential strategies and metrics, including

14  competitive analysis of Target and other similar competitors, in Amazon's supply chain and

15  logistics operations.  Mr. Valdez's participation in OLT encompassed all aspects of Amazon's

16  supply chain and logistics operations.

17          32.    Mr. Valdez has recently been responsible for executing Amazon's North America

18  Supply Chain, managing and negotiating confidential contracts with carriers and line-haul truck

19  management, and is intimately familiar with the confidential details and management of Amazon's

20  contracts with its transportation vendors.  This is core Confidential Information for Amazon,

21  because if Target knew that information it could negotiate against Amazon's numbers and manage

22  its costs to Amazon's costs in that area to Amazon's competitive detriment.

23          33.    In March 2013, Mr. Valdez noted in an internal review that he knew "how our

24  company operates at the highest levels of the organization."  He reported that he relied on "the

25  detailed engagement [he] had with the highest levels of analytical people in the operations team"

26  and, in this position, he "learn[ed] how to hire thinkers, strategic leaders, scientists and analytical

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF - 13

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

4847-2581-5342

doers." He recognized that in his role at the corporate office he had turned away from his past "tactical leadership role . . . in the field" to work at a senior level with Amazon's strategic leaders.

34.     In his leadership roles at Amazon, Mr. Valdez has developed intimate knowledge of the proprietary metrics and analytics that Amazon uses to measure and enhance the success of its supply chain performance, including transportation, fulfillment and logistics.  He has worked with Amazon's technology partners to build Amazon's confidential tools for operational efficiency.

35.     Recently, Mr. Valdez noted that his role had been to "build our new business Amazon Logistics (AMZL) from an operational perspective, which included hiring the global corporate and the in-country leadership team's [sic] to innovate, align the regional execution teams to standard operational practices, create new process for last mile delivery and build out the infrastructure with delivery stations and delivery personnel to increase the amount of volume delivered through AMZL."

36.     In his recent roles at Amazon, Mr. Valdez has defined topology (the optimal sites, sizes and capacities for Fulfillment Centers) using Amazon's proprietary metrics.  He explicitly touted that expertise to Target's executives when interviewing with Target.  Moreover, he was privy to and involved in developing Amazon's highly confidential plan to achieve specific cost improvements and Amazon's plan to achieve the ideal fulfillment cost per unit, plans that would have specific application to his work at Target to Amazon's competitive detriment.

37.     In 2015, Mr. Valdez participated in Amazon's executive level review of the detailed, highly confidential performance and business plans for Amazon's Worldwide Customer Service group, Amazon's sort centers, the Supply Chain Optimization Technology team, AmazonFresh, Prime Pantry, the Campus Operations group, the Amazon Robotics group, the AMZL group, and Prime Now (one-hour delivery service) through 2019.  Central to all of these discussions was Amazon's analysis of its target operational supply chain costs and how best to achieve planned cost improvements, as well as Amazon's confidential best practices in supply chain and transportation. This information is deeply proprietary and is directly used when shaping Amazon's competition

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF - 14

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

against Target.  Mr. Valdez attended and participated in numerous other high level, confidential strategy meetings, which covered Amazon's competition with Target and other retailers.

38.    Mr. Valdez learned from his work with Amazon, the worldwide leader in e-commerce, Confidential Information including but not limited to:  (1) the precise business plan and forward-looking strategy for Amazon's supply chain system now and through 2019; (2) the identity of the companies supplying transportation services to Amazon and the current terms of Amazon's contracts with those third parties; (3) the precise metrics that guide each step of Amazon's highly efficient and timely supply chain, which have been derived after extensive experimentation and analysis; (4) the software programs that are critical to accomplishing Amazon's highly confidential metrics, what problems they address and solve, and, just as importantly, those software programs which have been deemed ineffective through Amazon's experience; (5) the optimal use of third-party transportation providers and variations from market to market; (6) the best sources and methods for hiring and retaining and training skilled employees; (7) the highly confidential and detailed business plan for Amazon's retail e-commerce business overall, including secret new supply chain initiatives in process now; (8) confidential pricing philosophy related to product and costs to deliver that product; (9) proprietary analysis, systems and metrics for Amazon's "topology footprints"; (10) how Amazon's supply chain links to and interacts with Amazon's e-commerce business; and, (11) analysis and strategic planning related to frequent highly confidential executive level competitive reviews, such as the 2015 Holiday Lessons Learned analysis described below.  All of this is information that is defined as "Confidential" under Amazon's Noncompetition Agreement with Mr. Valdez and that Mr. Valdez agreed he would never divulge or use after the termination of his employment with Amazon and which Amazon maintains as secrets.

39.    On information and belief, in December 2015, Mr. Valdez submitted his resume to Target and called out the very high-level knowledge he had gained from "[p]articipat[ing] in strategic planning with other senior leaders at Amazon across multiple entities, including retail, IT,

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF - 15

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

4847-2581-5342

web services, supply chain, finance, and transportation." He promoted his "recent roles with Amazon, determin[ing] strategy for topology of operational locations, capital assessment, management requirements, engineering design, capacity management, financial management, and P&L oversight as it relates to entire Amazon operation." Attached hereto as **Exhibit D** is a true and correct copy of the referenced resume which is incorporated herein by this reference.

40.     In January 2016, while interviewing with Target, Mr. Valdez outlined areas he wanted to discuss with Target's most senior executives. These subjects reflected not only core aspects of his knowledge of Amazon's confidential information, training and expertise, but also the exact title and topics of a meeting Mr. Valdez was contributing to, provided information about, and participating in at Amazon. This meeting, the "Holiday Lessons Learned" meeting of Amazon's top supply chain executives, is one of the most confidential aspects of Amazon's analysis and planning. It synthesized past data and lessons into forward looking strategy, an analysis that included confidential analysis of Amazon's competition against Target. This analysis culminated in a highly confidential analytical paper titled "2015 Holiday Lessons Learned," a copy of which was provided to Mr. Valdez.

41.     Mr. Valdez's discussion topics for Target's Executive Vice-President and COO were "key lessons learned from this past peak holiday season." In almost every outline for each top Target executive with whom Mr. Valdez interviewed, he identified a topic about which he possessed internal Confidential Information from Amazon (*e.g.*, "key operational problems . . . being impacted by supply chain," "Improved technology between stores and supply chain," "operational innovation," "faster delivery of an increased availability of selection," "store topology footprint," "talent hiring and development," "e-commerce platform," *etc.*). Notably, these were the topics Mr. Valdez specifically highlighted to Target in order to land his proposed executive job there.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF - 16

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

4847-2581-5342

42.     Mr. Valdez acquired this information because Amazon employed and paid him to manage and participate in the development of much of it, and included him in the highest levels of decision-making in Amazon's supply chain, logistics and related business.

**D.      Commencement of Mr. Valdez' Employment with Target.**

43.     Mr. Valdez gave notice to Amazon on February 17, 2016 that he intended to take a new job at Target.  His attorney then informed Amazon that Mr. Valdez would start at Target on March 28, 2016.  Mr. Valdez represented to Amazon that his new job would not violate the Noncompetition Agreement because his work for Target would not be competitive with Amazon; he would be working only on delivering products from warehouses to stores.  While Amazon disagreed with this premise, Mr. Valdez's representations to Amazon that his work at Target would be of limited competitive scope were resoundingly rebutted by Target.

44.     Shortly after Mr. Valdez's departure from Amazon, Target's COO conducted an investor call to focus on Target's goal for the future of "modernizing supply chain."  The reason for this priority he explained was that Target's customers "can still shop our stores to get the products they need. . . .  But they can also shop online and have the order delivered to their home or . . . they can order online and pick up in store. . . ."  This description effectively encompasses the very customers for which Amazon and Target compete in the retail market, and acknowledges the reality that the company which does a better job with its supply chain and logistics of making products available faster and more conveniently has a competitive advantage with those customers.

45.     Target has been quite clear about who, in the absence of the relief requested here, will lead that effort at Target and why.  Target's press release announcing Mr. Valdez's hire touts that Mr. Valdez "will lead Target's supply chain transformation including planning, distribution and transportation."  *See* **Exhibit B.**

46.     Mr. Valdez worked in each of these areas at Amazon as a leader implementing and creating Amazon's confidential processes and methods that have made it the industry leader in these areas.  Target recognizes this and embraces it.  Target's COO told investors his enthusiasm for

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF - 17

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

4847-2581-5342

Mr. Valdez was in significant part based on Mr. Valdez's experience for the past 16 years at "Amazon, where he led the company's international supply chain expansion and worldwide logistics function. . . . He has designed efficient, cost-effective and fast operations [at Amazon] and developed innovative ways to move product close to the consumer [at Amazon]. His experience [at Amazon] and track record [at Amazon] have signaled he is the right person to help move Target forward." *See* **Exhibit C.** While Target left out references to numerous other responsibilities Mr. Valdez had as an Amazon supply chain and logistics executive, Target clearly seeks to trade on his experience both in implementing and in creating Amazon's confidential and proprietary processes and practices that support Amazon's industry leading position in supply chain and logistics. After all, Mr. Valdez's title at Target will be Executive Vice President and Chief Supply Chain and Logistics Officer, reporting directly to the COO.

47. Amazon contacted both Mr. Valdez, via his attorney, and Target to confirm the nature of his position, to inform both Mr. Valdez and Target that Amazon viewed Target as a direct competitor in the retail industry, and that his running a key competitive target market segment at Target would be a violation of his noncompetition obligations to Amazon under the Noncompetition Agreement and otherwise. Amazon sought a negotiated resolution but was unsuccessful.

48. In his new position at Target, Valdez is or will be the Executive Vice-President responsible for Target's competition against Amazon in supply chain and logistics activities, contrary to the restrictions of his Noncompetition Agreement. To manage and improve those processes, he will necessarily reference and thus disclose Amazon's confidential processes and procedures in Amazon's own supply chain. That is Mr. Valdez's only frame of reference. These efforts to target current or potential Amazon customers and to succeed in a core Amazon Target Market will use confidential Amazon information to allow Target unfairly to compete with Amazon in the key retail area of supply chain management, all in violation of the Noncompetition Agreement and of Amazon's rights under law.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF - 18

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

4847-2581-5342

**E.   Amazon's Confidential Information, Its Customers, and Its Competitive Business Position Are Threatened by Mr. Valdez's Target Employment.**

49.     Mr. Valdez's considerable knowledge of Amazon's sensitive, privileged, confidential, proprietary, and trade secret information would greatly assist him and Target to compete with Amazon, to Amazon's detriment.

50.     Amazon's confidential information and trade secrets are the results of significant and long-term investments of money and resources, and Amazon takes extensive steps to keep them confidential.

51.     Target is currently accepting and soliciting business from retail market sectors, segments, and groups ("Target Markets") which Amazon solicited, targeted, and accepted business from (or-actively planned to solicit, target, and accept business from) prior to Mr. Valdez's termination date, *e.g.,* retail customers.  The products and services offered by Target to such Target Markets are presently and, on information and belief will in the future remain, substantially the same as various competing products and services offered by Amazon to such Target Markets.  Such acceptance or solicitation by Target will be competitive with and otherwise deleterious to Amazon's business activities and anticipated business activities with regard to those Target Markets.  If Mr. Valdez is allowed to work at Target managing and directing its supply chain, transportation and logistics activities, or otherwise supporting those areas, he will violate Section 3(c)(ii) and (iii) of the Noncompetition Agreement by directly or indirectly participating in and supporting such activities.

52.     On information and belief, by negotiating with transportation and logistics vendors, Target intends to enter into or propose to enter into business arrangements with entities with which, prior to Mr. Valdez's termination date, Amazon was involved in substantially the same business arrangements or had held discussions regarding the possibility of entering into similar business arrangements (*e.g.,* UPS, USPS, J.B. Hunt, crowdsourced vendors, *etc.*).  Target's entering into such business arrangements would be competitive with and otherwise deleterious to the interests of Amazon.  If Mr. Valdez is allowed to work at Target in its supply chain operations such that he is

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF - 19

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

4847-2581-5342

involved with such business arrangements, he will violate Section 3(c)(iv) of the Noncompetition Agreement by directly or indirectly participating in and supporting such activities.

53.    Mr. Valdez's threatened violations of the Noncompetition Agreement will cause irreparable harm to Amazon.

## V.   CLAIMS

**A.    Breach of the Noncompetition Agreement.**

54.    Amazon incorporates herein all allegations in the preceding paragraphs of this Complaint.

55.    As a condition of his employment, Mr. Valdez entered into a valid and binding Noncompetition Agreement with Amazon in which he promised that he would not, for a period of 18 months following termination of his employment with Amazon, compete with Amazon for its existing or prospective customers, Target Markets, and/or business partners.

56.    Mr. Valdez received ample consideration to support the Noncompetition Agreement.

57.    Mr. Valdez has commenced or will shortly commence employment with Target as its Executive Vice-President and Chief Supply Chain and Logistics Officer, leading all of Target's supply chain and logistics operations, a job which encompasses and trades on *all* his prior work at Amazon, is directly competitive on behalf of Target against Amazon in the companies' battle for customers, and about which Mr. Valdez holds Amazon Confidential Information that he will reference in his work for Target.  Mr. Valdez will directly or indirectly compete with Amazon for its existing or prospective customers, target markets, and/or business partners.

58.    Mr. Valdez's breach of the Noncompetition Agreement will cause irreparable harm to Amazon and should therefore be enjoined as expressly authorized by the terms of the Noncompetition Agreement.

**B.    Breach of Common Law Duties of Confidentiality and Loyalty.**

59.    Amazon incorporates herein all allegations in the preceding paragraphs of this Complaint.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF - 20

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

4847-2581-5342

60.     As a high-ranking executive, with access to Amazon's trade secrets and other confidential and proprietary information, Mr. Valdez had a confidential and fiduciary relationship with Amazon and a duty to maintain the secrecy of, and to protect from use or disclosure, its confidential information.

61.     Mr. Valdez has breached or will imminently breach his duty of loyalty to Amazon by taking, using and disclosing to Target trade secrets and other confidential and proprietary information belonging to Amazon and by using such information on behalf of Target.

62.     As a result of these breaches, Mr. Valdez has been or will be unjustly enriched and Amazon has suffered or will suffer damage.  Amazon will suffer irreparable harm if Mr. Valdez is not enjoined from disclosing and using Amazon's confidential and proprietary information for his own gain.

**C.     Misappropriation of Trade Secrets.**

63.     Amazon incorporates herein all allegations in the preceding paragraphs of this Complaint.

64.     The confidential and proprietary information entrusted to Mr. Valdez by Amazon constitutes trade secrets because Amazon derives economic value from the information not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

65.     The confidential and proprietary information entrusted to Mr. Valdez by Amazon constitutes trade secrets and because the information was the subject of reasonable efforts to maintain its secrecy.

66.     Due to his roles at Amazon and Target, Mr. Valdez has willfully misappropriated or will imminently and inevitably misappropriate, Amazon's trade secrets, in violation of applicable law, including Washington's Uniform Trade Secrets Act.

67.     As a result of his inevitable misappropriation and unauthorized use, Mr. Valdez has been or will be unjustly enriched and Amazon has suffered or will suffer damage.  Amazon is

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF - 21

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

4847-2581-5342

suffering and will suffer irreparable harm if defendant is not enjoined from further violations and misappropriations.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Amazon respectfully prays for the following relief:

A.      Entry of a temporary restraining order, preliminary injunction, and permanent injunction that:

i.      Enjoins Mr. Valdez from all actions in violation of, or that would interfere with Amazon's rights under, the Noncompetition Agreement, including but not limited to enjoining him from engaging in any activities which directly or indirectly support Target's supply chain and logistics operations;

ii.     Prohibits Mr. Valdez from disclosing, misusing, or misappropriating for his use or the use of others any confidential or proprietary information or trade secrets of Amazon or its subsidiaries;

iii.    Requires Mr. Valdez to return to Amazon's counsel all property, documents, files, reports, work product, and/or other materials, if any, which Mr. Valdez has in his possession, custody, or control which were obtained from Amazon or which constitute work product owned by Amazon or any of its subsidiaries;

iv.     Prohibits Mr. Valdez, for a period of 18 months after March 1, 2016, from engaging in any activities which directly or indirectly support Target's supply chain and logistics operations;

B.      For judgment against Mr. Valdez for damages, including damages for his unjust enrichment, in an amount to be proven at trial;

C.      Pre-judgment and post-judgment interest;

D.      An award of Amazon's attorneys' fees and costs to the degree allowed by governing law; and

E.      Such further relief as the Court deems just and equitable.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF - 22

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

4847-2581-5342

1

DATED this 21st day of March, 2016.

2

SUMMIT LAW GROUP PLLC
3
Attorneys for Plaintiff

4
By *s/ Philip S. McCune*
Philip S. McCune, WSBA #21081
5
Jessica L. Goldman, WSBA #21856
Molly A. Terwilliger, WSBA #28449
6
*philm@summitlaw.com*
*jessicag@summitlaw.com*
7
*mollyt@summitlaw.com*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF - 23

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

4847-2581-5342

# EXHIBIT A

**AMAZON.COM, INC.**

### CONFIDENTIALITY, NONCOMPETITION AND
### INVENTION ASSIGNMENT AGREEMENT

AGREEMENT dated as of _June 18th_ , 20_02_ by and between Amazon.com, Inc., a Delaware corporation, and _Arthur Valdez_ (the "Employee"). As used herein, the "Company" shall mean Amazon.com, Inc. and any affiliate of Amazon.com, Inc., meaning any entity that controls, is controlled by, or under common control with, Amazon.com, Inc.

### RECITALS

Employee is entering into this Agreement in connection with his or her acceptance of employment with the Company and as a condition of such employment.

### AGREEMENTS

NOW, THEREFORE, in consideration of the foregoing and in consideration of their mutual promises and agreements contained herein, the parties hereto agree as follows:

1.    **Disclosure and Delivery to the Company**

    (a)    <u>Disclosure of Information to the Company</u>.  During the course of employment and at the termination thereof, the Employee shall promptly disclose and deliver over to the Company, without additional compensation, to the extent that such disclosure could reasonably be expected to be of interest to the Company, in writing, or in such form and manner as the Company may reasonably require, the following ("Disclosure Information"):

        (i)    any and all algorithms, procedures or techniques related to the Company's business activities or to the Employee's work with the Company, and the essential ideas and principles underlying such algorithms, procedures or techniques, conceived, originated, adapted, discovered, developed, acquired, evaluated, tested, or applied by the Employee while employed by the Company, whether or not such algorithms, procedures or techniques are embodied in a computer program;

        (ii)    any and all pricing or marketing strategies, the essential ideas and principles on which such strategies are based, and any information that might reasonably be expected to lead to the development of such strategies, conceived, originated, adapted, discovered, developed, acquired, evaluated, tested, or applied by the Employee while employed by the Company;

        (iii)    any and all products and services, and the essential ideas and principles underlying such products and services, conceived, originated, adapted, discovered, developed, acquired, evaluated, tested, or applied by the Employee while employed by the Company, whether or not such products or services are marketed, sold, or provided by the Company; and

        (iv)    any other ideas or information conceived, originated, adapted, discovered, developed, acquired, evaluated, tested, or applied by the Employee while employed by the Company if the idea or information could reasonably be expected to prove useful or valuable to the Company.

    (b)    <u>Certain Qualifications and Recognitions</u>.  The Employee recognizes that he or she will hold an important position at the Company, and that, as one of his or her important job duties, he or she will be expected to conceive, originate, adapt, discover, develop, acquire, evaluate, test, and/or apply ("Conceive and/or Originate") products, services, techniques, algorithms, strategies, procedures and/or ideas ("Products and/or Services"), even when, in order to do so, the Employee must help lead the Company in new directions,

9/29/09

or into activities and business areas which are new to the Company. However, the Company recognizes that the Employee may Conceive and/or Originate certain Products and/or Services which are unrelated to the activities of the Company, unrelated to the planned activities of the Company, and unrelated to any reasonable extension of the activities or planned activities of the Company ("Unrelated Products and/or Services"). The parties therefore agree, the other provisions of this Section 1 notwithstanding, that:

      (i)      any Unrelated Products and/or Services Conceived and/or Originated by the Employee, even while employed by the Company, shall not be considered Disclosure Information;

      (ii)      the fact that the Employee used modest amounts of Company equipment or facilities (for example, by sending e-mail messages using Company computers and network connections) in the course of Conceiving and/or Originating an Unrelated Product and/or Service shall not cause an Unrelated Product and/or Service to be considered Disclosure Information;

      (iii)      the fact that the Employee Conceived and/or Originated a Product and/or Service during the Company's normal operating hours or on the Company's premises shall not cause an Unrelated Product and/or Service to be considered Disclosure Information;

      (iv)      the fact that the Employee Conceived and/or Originated a Product and/or Service outside of the Company's normal operating hours or off of the Company's premises shall not, in and of itself, prevent a Product and/or Service from being considered Disclosure Information.

      (c)      Information Obtained from Third Parties. For purposes of this Section 1, information "acquired" shall be deemed to include information relayed to the Employee by third parties, whether or not such third parties were compensated by the Company in connection with such acquisition.

      **NOTICE:** Notwithstanding any other provision of this Agreement to the contrary, this Agreement does not obligate Employee to assign or offer to assign to the Company any of Employee's rights in an invention for which no equipment, supplies, facilities or trade secret information of the Company was used and which was developed entirely on Employee's own time, unless (a) the invention relates (i) directly to the business of the Company or (ii) to the Company's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by Employee for the Company. This satisfies the written notice and other requirements of RCW 49.44.140.

2.      Confidential Information

      (a).      Definition of Confidential Information. The parties acknowledge that, in order to permit the Employee to successfully perform and/or continue to perform the duties associated with his or her employment with the Company, it is necessary for the Company to provide the Employee with access to certain valuable proprietary information and knowledge of certain modes of business operation ("Confidential Information") which are essential to the effective operation of the Company, and which give the Company a competitive advantage over other firms pursuing related business activities. In the context of this Agreement, the term "Confidential Information" shall be deemed to include:

      (i)      the identity of the Company's business partners, customers, investors, or joint venturers, vendors, or suppliers;

      (ii)      computer software developed by the Company;

      (iii)      data of any sort compiled by the Company, including, but not limited to, data on the effectiveness of any particular marketing campaign or advertising venue or method, or demographic or other data related to the Company's customers or prospective customers;

9/29/09

(iv)     the fact that the Company uses, has used, or has evaluated for potential use a particular computer program or system, or any particular database or source of data, supplied by a party other than the Company;

(v)     algorithms, procedures or techniques, or the essential ideas and principles underlying such algorithms, procedures or techniques, developed by, or whose workings are otherwise known to, the Company (but excluding any public domain algorithms, procedures, or techniques, and excluding any algorithms, procedures, or techniques licensed by the Company from a third party on a non-exclusive basis), whether or not such algorithms, procedures or techniques are embodied in a computer program, including, but not limited to, techniques for identifying prospective customers, communicating effectively with prospective or current customers, reducing operating costs, or increasing system reliability;

(vi)     the fact that the Company uses, has used, or has evaluated for potential use any particular algorithm, procedure or technique, or the essential ideas and principles underlying such algorithm, procedure or technique, developed by a party other than the Company (including any algorithms, procedures or techniques in the public domain), whether or not such algorithms, procedures or techniques are embodied in a computer program;

(vii)     pricing or marketing strategies developed, investigated, acquired, evaluated, modified, tested or employed by the Company, or any information related to, or that might reasonably be expected to lead to, the development of such strategies;

(viii)     information about the Company's future plans, including, but not limited to, plans for expanding into new products or services;

(ix)     any information that would typically be included in the Company's financial statements, including, but not limited to, the amount of the Company's assets, liabilities, net worth, revenues, expenses, or net income;

(x)     information related to, or that might reasonably be expected to lead to, understanding the viability of selling any particular product or service via any particular vehicle such as interactive, computer-based shopping;

(xi)     any other information gained in the course of the Employee's employment with the Company that could reasonably be expected to prove deleterious to the Company if disclosed to third parties, including without limitation any information that could reasonably be expected to aid a competitor or potential competitor of the Company (a "Competitor") in making inferences regarding the nature of the Company's business activities, where such inferences could reasonably be expected to allow such a Competitor to compete more effectively with the Company.

(b)     <u>Use and Disclosure of Confidential Information.</u>

(i)     The Employee acknowledges that he or she has acquired and/or will acquire Confidential Information in the course of or incident to his or her employment with the Company, and that the ability of the Company to continue in business could be seriously jeopardized if such Confidential Information were to be used by the Employee or by other persons or firms to compete with the Company. Accordingly, the Employee agrees that he or she shall not, directly or indirectly, at any time, during the term of his or her employment with the Company or at any time thereafter, and without regard to when or for what reason, if any, such employment shall terminate, use or cause to be used any such Confidential Information in connection with any activity or business except the business of the Company, and shall not disclose such Confidential Information to any individual, partnership, corporation, or other entity unless such disclosure has been specifically authorized in writing by the Company, or except as may be required by any applicable law or by order of a court of competent jurisdiction, a regulatory or governmental body.

9/29/09

     (ii)     The provisions of Section 2(b)(i) notwithstanding, the Employee shall be free to disclose or use any information which is in or which enters the public domain prior to the time of such disclosure or use except where such information enters the public domain as a result of unauthorized actions of the Employee.

     (iii)     The provisions of Sections 2(b)(i) and 2(b)(ii) notwithstanding, the Employee shall be free to disclose or use any information which was obtained by the Employee prior to his or her employment with the Company other than information obtained by the Employee from the Company, and shall be free to disclose or use any information which is obtained by the Employee subsequent to and independent of his or her relationship with the Company.

     (c)     <u>No Waiver of Trade Secret Protection</u>.  Nothing contained in this Agreement shall be deemed to weaken or waive any rights related to the protection of trade secrets that the Company may have under common law or any applicable statutes.

     (d)     <u>Patents</u>.

     (i)     All patents, copyrights, trade secrets and other proprietary rights relating to the Confidential Information or to the Disclosure Information as defined in Section 1 shall be owned by the Company, including but not limited to any and/or all of the Confidential Information and/or Disclosure Information that does not qualify as "Works-Made-For-Hire," if any.  The Employee hereby irrevocably sells, assigns, transfers and conveys to the Company and its successors the Employee's entire right, title and interest in the Confidential Information and/or Disclosure Information and any improvements throughout the world, including, without limitation:

     (A)     all patents, copyrights, trade secrets and other proprietary rights in the Confidential Information and/or the Disclosure Information and all rights to secure registrations, renewals and extensions of the same;

     (B)     all rights to make use, practice, import, export and otherwise fully exploit the Confidential Information and/or the Disclosure Information and any and all improvements that the Employee or Company may hereafter make or develop;

     (C)     all rights to file and prosecute applications for patent protection covering the Confidential Information and/or the Disclosure information and improvements thereon, and the processes and designs embodied therein, in the United States and in every other country throughout the world;

     (D)     all rights under any patent which may be issued on the Confidential Information and/or the Disclosure Information or the improvements thereon, and any processes and designs therein, and all rights to enjoy the same; and

     (E)     all documents, notes, notebooks, drawings, schematics, prototypes, magnetically encoded media, or other materials related to the Confidential Information or to the Disclosure Information.

     (ii)     During the period of his or her employment with the Company, the Employee agrees to provide the Company with such information and know-how in the Employee's possession or control as may be necessary to use, market and/or develop the Confidential Information and the Disclosure Information and improvements.

     (iii)     During the period of his or her employment with the Company and as may be reasonably necessary subsequent to the Employee's employment, the Employee agrees to cooperate with the Company as may be necessary to obtain patent protection for the Confidential Information and the Disclosure Information and improvements and agrees to do such further acts and execute and deliver to Company such

9/29/09

instruments as may be required to perfect, register or enforce the Company's ownership of the rights conveyed under this Agreement. If the Employee fails or refuses to execute any such instruments (without regard to whether or not the Employee is at that time employed by the Company), the Employee hereby appoints the Company as the Employee's attorney-in-fact to act on the Employee's behalf and to execute such instruments. This appointment shall be irrevocable and deemed to be a power coupled with an interest.

     (e)     For purposes of this Section 2, the term Company shall be deemed to include the Company as well as any subsidiaries or affiliates of the Company that may, from time to time, become associated with the Company.

**3.**     **Competitive Activities**

     (a)     During the period of his or her employment with the Company, the Employee will not, directly or indirectly, and whether or not for compensation, either on his or her own behalf or as an employee, officer, agent, consultant, director, owner, partner, joint venturer, shareholder, investor, or in any other capacity (except in the capacity of an employee of the Company acting for the benefit of the Company), knowingly engage in any activity or business which is of the same nature as, or substantively similar to, an activity or business of the Company or an activity or business which the Company is developing and of which the Employee has knowledge.

     (b)     While employed by the Company and for a period of twelve (12) months after the date the Employee ceases to be employed by the Company, without regard to when or for what reason if any, such employment shall terminate (the "Termination Date"), the Employee will not, directly or indirectly, and whether or not for compensation, either on his or her own behalf or as an employee, officer, agent, consultant, director, owner, partner, joint venturer, shareholder, investor, or in any other capacity (except in the capacity of an employee of the Company acting for the benefit of the Company), knowingly employ, or retain as a consultant or contractor, or cause to be so employed or retained, or enter into a business relationship with any person who:

     (i)     is an employee of the Company or has been employed by the Company at any time within the twelve (12) months prior to the date of such act; or

     (ii)     is a consultant, sales agent, contract programmer, or other independent agent retained by the Company; or

     (iii)     has been retained by the Company as a consultant, sales agent, contract programmer, or other independent agent at any time within the twelve (12) months prior to the date of such an act.

     (c)     While employed by the Company and for a period of 18 months after the date the Employee ceases to be employed by the Company, without regard to when or for what reason, if any, such employment shall terminate, the Employee will not, directly or indirectly, and whether or not for compensation, either on his or her own behalf or as an employee, officer, agent, consultant, director, owner, partner, joint venturer, shareholder, investor, or in any other capacity (except in the capacity of an employee of the Company acting for the benefit of the Company), knowingly:

     (i)     accept or solicit employment with, or accept or solicit a consulting assignment with, or accept or solicit investment capital, directly or indirectly, from any individual or entity, or from an officer, partner, or principal of any entity, from which the Company has accepted investment capital, or with which, prior to the Termination Date, the Company has held serious discussions regarding the possibility of securing investment capital ("Investors or Prospective Investors"), provided, however, that this Section 3(c)(i) shall not apply to Investors or Prospective Investors that are introduced to the Company through the efforts of the Employee; or

     (ii)     accept or solicit employment with, or accept or solicit a consulting assignment with, or accept or solicit business from any individual or entity that was a customer or client of the Company prior to

9/29/09

the Termination Date, or with which the Company had engaged in serious discussions prior to the Termination Date related to the possibility that such individual or entity might become a customer or client of the company (a "Current or Prospective Customer"), if the product or service provided by the Employee to such Current or Prospective Customer is substantially the same as a product or service offered by the Company to such Current or Prospective Customer, and such acceptance or solicitation would be competitive with or otherwise deleterious to the Company's own business relationship or anticipated business relationship with such Current or Prospective Customer; or

(iii)    accept or solicit business from any retail market sector, segment, or group that the Company has solicited, targeted, or accepted business from prior to the Termination Date, or has actively planned, prior to the Termination Date, to solicit, target, or accept business from (the "Target Market"), if the product or service provided or offered by the Employee to such Target Market is substantially the same as a product or service provided or offered by the Company to the Target Market, and such acceptance or solicitation would be competitive with or otherwise deleterious to the Company's own business activities, or anticipated business activities, related to the Target Market; or

(iv)    enter into or propose to enter into any business arrangement with any entity with which, prior to the Termination Date, the Company was involved in substantially the same business arrangement, or with which, prior to the Termination Date, the Company had held discussions regarding the possibility of entering into such an arrangement, if such arrangement would be competitive with or otherwise deleterious to the interests of the Company.

(d)    A clarifying example.  The following example is intended to reflect the intent of the parties in Section 3(c)(iii).  Assume for the sake of this example that the Company is selling a variety of books, CD-ROMS, and shrinkwrapped computer software to a particular target market on the Internet via an online interactive catalog, and is actively planning to sell video tapes to the same target market.  In addition, the Company has had internal discussions regarding the possibility of selling music CD's, but, so far as the Employee is aware, the Company has not, as of the Employee's Termination Date, made any concrete plans to sell music CD's (for example, the Company has not investigated the size of the music CD market, has not investigated the competition in that market, and has not contacted any prospective music CD suppliers).  Under these assumptions, Section 3(c)(iii) would in no way restrict the Employee from selling music CD's, or working for a Company which sells music CD's, to that same target market via an online interactive catalog on the Internet.

(e)    Further Clarification on Sections 3(c)(ii) and 3(c)(iii).  For purposes of Sections 3(c)(ii) and 3(c)(iii), the fact that two services (where one is being compared to the other) both involve software development shall not, in and of itself, be enough to cause the two services being compared to be deemed "substantially the same."

(f)    For purposes of this Section 3, the term Company shall be deemed to include the Company as well as any subsidiaries or affiliates of the Company that may, from time to time, become associated with the Company.

4.    Reasonableness of Covenants

(a)    Certain Recognitions.  The Employee recognizes that the restrictions set forth in Sections 2 and 3 of this Agreement may seriously limit his or her future flexibility in many ways.  For example (this example is not to limit in any way the restrictions specified in this Agreement), the provisions set forth in Section 3 will make it impossible for the Employee to seek or accept certain opportunities for a period of 18 months after the Termination Date, despite the fact that such opportunities might be highly attractive to the Employee and provide greater compensation than any other available opportunities, and despite the fact that after the 18 month period has elapsed such highly attractive opportunities may no longer be available to the Employee.  The Employee acknowledges that the restrictions specified in Sections 2 and 3 are reasonable in view of the nature of the business in which the Company is engaged, the Employee's position with the

-6-

9/29/09

Company, and the Employee's knowledge of the Company's business. The Employee recognizes that his or her compensation (cash, equity and otherwise) reflects his or her agreement in Sections 2 and 3, and acknowledges that he or she will not be subject to undue hardship by reason of his or her agreement to Sections 2 and 3.

(b)     Modification of Restriction. Notwithstanding anything contained in Sections 2 or 3 of this Agreement to the contrary, if a court of competent jurisdiction should hold any restriction specified in Sections 2 or 3 to be unreasonable, unenforceable, illegal or invalid, then that restriction shall be limited to the extent necessary to be enforceable, and only to that extent. In particular, and without limitation on the foregoing, if any provision of Sections 2 or 3 should be held to be unenforceable as to scope or length of time or geographical area involved, such provision shall be deemed to be enforceable as to, and shall be deemed to be amended to cover, the maximum scope, maximum length of time, or broadest area, as the case may be, which is then lawful.

(c)     Survival of Covenants. The obligations of the Employee under Sections 2 and 3 of this Agreement shall survive the termination of this Agreement and of his or her employment with the Company.

5.     **Employee Representations**

Employee represents and certifies as follows: (a) Employee is not in possession or control of any document(s) that in any way constitute confidential, proprietary or trade secret information of a third party (including any former employer); (b) Employee is not subject to a non-competition agreement that would preclude his or her employment with the Company; (c) Employee has identified all confidentiality, proprietary information, non-solicitation or similar agreements or obligations that it has with any third party and that, in the course of his or her work for the Company, he or she shall not violate any such agreements or obligations; and (d) Employee, in the course of his or her work for the Company will not use or disclose any tangible or intangible information that constitutes a trade secret of a third party (including a former employer) except pursuant to written authorization to do so (e.g. a technology license between the Company and any third party).

6.     **Remedies**

The Employee acknowledges that any breach of this Agreement may cause the Company irreparable harm for which there is no adequate remedy at law, and as a result of this, the Company shall be entitled to the issuance by a court of competent jurisdiction of an injunction, restraining order, or other equitable relief in favor of itself, without the necessity of posting a bond, restraining the Employee from committing or continuing to commit any such violation. Any right to obtain an injunction, restraining order, or other equitable relief hereunder shall not be deemed a waiver of any right to assert any other remedy the Company may have at law or in equity.

7.     **Relationship of the Parties; Attention and Effort**

The relationship between the Company and the Employee hereunder is agreed to be solely that of employee and employer. Nothing contained herein and no modification of responsibility or compensation made hereafter shall be construed so as to constitute the parties as partners or joint venturers or so as to constitute the Employee as an independent contractor. During the term of Employee's employment with the Company, and without limiting the provisions of Section 3 of this Agreement or any other provision hereof, Employee will devote all of his or her entire productive time, ability, attention and effort to the Company's business and will skillfully serve its interests and will not carry on any professional or other gainful employment.

8.     **Amendment or Alteration.**

No amendment or alteration of the terms of this Agreement shall be valid unless made in writing and signed by both of the parties hereto.

9/29/09

9.     **Governing Law and Jurisdiction**

This Agreement, and any disputes which may arise under, out of or in connection with this Agreement, shall be governed by and construed in accordance with the laws of the State of Washington.  Jurisdiction over and venue of any suit arising out of or related to this agreement shall be exclusively in the state and federal courts of King County, Washington.

10.     **Severability**

The holding of any provision of this Agreement to be illegal, invalid, or unenforceable by a court of competent jurisdiction shall not affect any other provision of this Agreement, which shall remain in full force and effect.

11.     **Waiver**

The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion or occasions shall not be considered a waiver thereof or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

12.     **Entire Agreement**

This Agreement contains the entire agreement of the parties and shall supersede any and all existing agreements between the Employee and the Company or any of its affiliates or subsidiaries relating to the subject matter hereof.

13.     **Assignment**

Except as otherwise provided in this paragraph, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, representatives, successors and assigns.  Neither this Agreement nor any right or interest hereunder shall be assignable by the Employee, his or her beneficiaries, or legal representatives without the Company's prior written consent; provided, however, that nothing in this Section 13 shall preclude the Employee from designating a beneficiary to receive any benefit payable hereunder upon his or her death, or the executors, administrators, or other legal representatives of the Employee or his or her estate from assigning any rights hereunder to the person or persons entitled thereunto.  This Agreement shall be assignable by the Company only to a subsidiary or affiliate of the Company; or to any corporation, partnership, or other entity that may be organized by the Company, or by its owners, as a separate business unit in connection with the business activities of the Company or of its owners; or to any corporation, partnership, or other entity resulting from the reorganization, merger or consolidation of the Company with any other corporation, partnership or other entity, or any corporation, partnership, or other entity to or with which all or any portion of the Company's business or assets may be sold, exchanged or transferred.

14.     **No Attachment**

Except as required by law, no right to receive payments under this Agreement shall be subject to anticipation, commutation, alienation, sale, assignment, encumbrance, charge, pledge, or hypothecation, or to execution, attachment, levy, or similar process or assignment by operation of law, and any attempt, voluntary or involuntary, to effect any such action shall be null, void and of no effect.

15.     **Headings**

The Section headings appearing in this Agreement are used for convenience of reference only and shall not be considered a part of this Agreement or in any way modify, amend or affect the meaning of any of its provisions.

9/29/09

16.     **Rules of Construction**

Whenever the context so requires, the use of the masculine gender shall be deemed to include the feminine and vice versa, and the use of the singular shall be deemed to include the plural and vice versa.

IN WITNESS, WHEREOF, the parties have executed this Agreement on the date first written above.

**AMAZON.COM, INC.**

Signature:

Name:            Anthony J. Galbato

Title:             VP, Human Resources

**EMPLOYEE**

Signature:

Name:     ARTHUR L. VALDEZ JR.

Title:      VP, NA Supply Chain & Transportation

-9-

9/29/09

# EXHIBIT B

# Target Corporation Names Arthur Valdez Executive Vice President, Chief Supply Chain and Logistics Officer

f     𝕏     in     𝓅



find answers to some
of the questions we
hear most frequently.

MINNEAPOLIS - February 29, 2016 – Today **Target Corporation (NYSE: TGT)** announced the hiring of **Arthur Valdez** as executive vice president, chief supply chain and logistics officer. Valdez will lead Target's supply chain transformation including planning, distribution and transportation. He will report to Target's executive vice president and chief operating officer, John Mulligan.

Valdez is a seasoned supply chain leader with extensive experience in both direct-to-consumer and direct-to-store operations. He comes to Target from Amazon where he spent the last 16 years. During that time, he held leadership positions across the company's global and domestic supply chain, including transportation, fulfilment and logistics. Most recently he was Amazon's vice president of operations focused on the company's international supply chain expansion. In addition, during his 20-plus year retail career, he also has held positions with Walmart and Kmart.

"While we've made significant progress in improving our operations, Target's growth hinges on our ability to

## get in touch

### media hotline

We strive to return all of our
media inquiries within one
business day.

✉ **email us**

☐ **(612) 696-3400**

### guest relations

**visit Target Help**

### investor relations

☐ **(612) 696-3400**

### advertising inquiries

✉ **media@target.com**

## stay connected

f   𝕏   ▶   𝓅   ⊡

## sign up for
## alerts & feeds

enhance the fundamental aspects of our business, starting with the supply chain," says Mulligan. "Arthur's leadership and experience will be a tremendous asset as we continue to drive improvements in end-to-end processes including leveraging our almost 1,800 stores to deliver a seamless experience for our guests."

Valdez joins the company March 28 and will relocate to Minneapolis.

- **Media Contact:** Molly Snyder (612) 696-3400
- **Investor Contact:** John Hulbert (612) 761-6627

**About Target Corporation**

Minneapolis-based Target Corporation (NYSE: TGT) serves guests at 1,792 stores and at Target.com. Since 1946, Target has given 5 percent of its profit to communities, which today equals more than $4 million a week. For more information, visit Target.com/Pressroom. For a behind-the-scenes look at Target, visit Target.com/abullseyeview or follow @TargetNews on Twitter.

**Target rss feeds**

**email alerts**

**company**
about Target
investors
press
**tags**
Corporate

**careers**
**corporate responsibility**
**news & features**

**Target.com**
find a store
contact us

  
  

privacy policy | terms & conditions | team member services

©2016 Target Brands, Inc. Target, the Bullseye Design and Bullseye Dog are trademarks of Target Brands, Inc.

# EXHIBIT C

THOMSON REUTERS STREETEVENTS

# EDITED TRANSCRIPT

TGT - 2016 Target Financial Community Meeting

EVENT DATE/TIME: MARCH 02, 2016 / 7:30PM GMT

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

THOMSON REUTERS

**MARCH 02, 2016 / 7:30PM, TGT - 2016 Target Financial Community Meeting**

## CORPORATE PARTICIPANTS

**John Hulbert** *Target Corporation - VP, IR*
**Brian Cornell** *Target Corporation - Chairman & CEO*
**Carolyn Sakstrup** *Target Corporation - VP, Guest Center of Excellence*
**Julie Guggemos** *Target Corporation - SVP, Product Design and Development*
**John Mulligan** *Target Corporation - EVP & COO*
**Cathy Smith** *Target Corporation - EVP & CFO*
**Jeff Jones** *Target Corporation - EVP & CMO*
**Mike McNamara** *Target Corporation - EVP & CIO*

## CONFERENCE CALL PARTICIPANTS

**Oliver Chen** *Cowen and Company - Analyst*
**Robbie Ohmes** *Bank of America Merrill Lynch - Analyst*
**Michael Lasser** *UBS - Analyst*
**Paul Trussell** *Deutsche Bank - Analyst*
**Daniel Fu** *Maplelane Capital - Analyst*
**Dan Binder** *Jefferies & Co. - Analyst*
**Matt Nemer** *Wells Fargo Securities - Analyst*
**Matt Fassler** *Goldman Sachs - Analyst*
**Chris Horvers** *JPMorganChase - Analyst*
**John Zolidis** *Buckinham Research - Analyst*
**Bob Drbul** *Nomura Securities - Analyst*
**Wayne Hood** *BMO Capital Markets - Analyst*

## PRESENTATION

**John Hulbert** - *Target Corporation - VP, IR*

Good afternoon, everyone. I'm John Hulbert, I lead our investor relations team here at Target and I want to welcome all of you here today. We are going to get started here in just a second, but we have a couple of housekeeping items we are going to take care of upfront.

So we've got two slides. I'm going to read these verbatim. Any forward-looking statements that we make this afternoon are subject to risks and uncertainties, the most important of which are described in our SEC filings. And our earnings press release and SEC filings available on target.com/investors provide reconciliations of adjusted EPS to our GAAP results and a reconciliation of the non-GAAP components of ROIC. With that, we can get started.

(video playing)

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.


**THOMSON REUTERS**

MARCH 02, 2016 / 7:30PM, TGT - 2016 Target Financial Community Meeting

**Brian Cornell** - *Target Corporation - Chairman & CEO*

Well, good afternoon and on behalf of Target, I want to thank you for joining us today. As you just saw, it's been quite a year and I have to say I'm really proud of our team and what they delivered during one of the most intense period of changes in our Company's history.

Looking back on this meeting a year ago, Target was in a very different place than where we are today. Last March, we were discontinuing our Canadian operations, restructuring our US headquarters and reworking our core operations. Most of you remember the state of play all too well. In 2015, when we gathered here together, we laid out an ambitious plan to put Target back on a path for profitable growth.

And if you look at the results today, one thing is clear. Our team delivered. We said that we would drive traffic back to our stores and we did. We finished 2015 with our fifth consecutive quarter of positive traffic growth. We hit the high range of our comp guidance. Signature categories led the way, growing almost 3 times faster than the rest of our business. We set a highly ambitious growth goal for digital and our sales topped 30%, shattering holiday records and lapping the industry for the year.

We also said everything was on the table and we meant it. We announced a $1.9 billion deal with CVS Health last June and we closed it six months later. We said we'd bring more industry expertise to Target and we welcomed world-class experts in virtually every aspect of the business from technology, to stores, supply chain, to merchandising and marketing.

Taking it all together, given the results we expected, we said we would deliver adjusted EPS between $4.45 and $4.65. When we closed out the year, again, our team delivered, $4.69 of adjusted EPS, well above our range. And importantly, 11% higher than the year before.

That's a growth story, a growth story that we are very proud of. Our focus on the fundamentals is driving this performance and I can tell you headlines like these certainly give our team a little spring in their step. But really this is the most important measure of all. Our guests are falling back in love with Target all over again.

So are we declaring victory? Not even close. Most of you know me all too well. No doubt we are very proud of the momentum and I'm proud of this team. But we've got a lot of work left to do and I'm very confident in the plan that's going to guide us going forward. Our ultimate goal, to drive profitable growth today, tomorrow and well into the future.

So I also know that you've got a job to do. Got to dig in, better understand what's driving our current performance and ultimately determine if we've developed a strategic framework that will sustain our current growth. We laid out a bold multi-year transformation agenda last March and you are going to see that the plan is consistent from one year to the next.

From the onset, we rallied our team around five key enterprise priorities and we will be laser-focused on those same initiatives in 2016. If anything, you will see that the road ahead will bring even greater focus, clarity, prioritization around the things that matter most to our guests. And that includes enhancing Target.com and mobile performance, offering a richer digital experience that deepens engagement, reduces friction no matter how our guests choose to shop.

We are creating more locally relevant experiences and bringing our new format strategy into key urban markets and college campuses. We are developing a meaningful rewards program that engenders love and loyalty. And we are implementing merchandising strategies based on category roles and growing share in those critically important signature businesses.

We've made a lot of progress against each one of these priorities, but before we go on, I think it's important to step back and paint the bigger picture to show you exactly where we are headed, what it will look like, what it will feel like to shop Target in the not-too-distant future.

So let's spend a few minutes and look at it through the eyes of a guest. Anna. She's a busy mom. She has two kids. Her youngest is turning six and the party is tomorrow. Anna works nearby in Midtown, takes the train home to North Jersey every night. Many of you know this all too well. Her routine is consistent. She picks up the kids at school and shuttles them off to an evening activity before returning home for dinner. Tonight, it's swimming lessons. It's been a hectic week and Anna hasn't had time for anything but the invitations.

3

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.


THOMSON REUTERS

**MARCH 02, 2016 / 7:30PM, TGT - 2016 Target Financial Community Meeting**

So while she's on the [path] train, she pulls up her Pinterest board, taps the Target app and thumbs through her list. It's going to be a Star Wars party. Everything is easy to find, all in one place -- balloons, streamers, even the cake crawling with storm troopers. She picks out the blue light saber that belongs to her daughter's hero. Two more taps, she's done with her list. Her order will be waiting when she gets to the store. Anna has 30 minutes to get to the school, make her Target run and get the kids in the pool.

When she gets to the store, she gets a text message to let her know the order is ready. She grabs some chicken wraps, fruit for dinner, fills her basket with a few other things she remembered along the way and Anna checks out. She collects her Cartwheel deals. The party, it's a hit. And all is well in that galaxy far, far away.

So now you are probably wondering, Brian, is that the future? It is because everything worked and it was really easy. Aside from her children, Anna's most treasured thing in life is time. She had 30 minutes to plan a party. She had no margin for error. She had to pick one retailer that could make it all happen and she picked Target. Any little hiccup -- the apps running too slow, the fruits not fresh, no blue light sabers in the tri-state area -- we let Anna down and in the past, we might have missed the mark on any one of those things. And it cost us sales and it cost us a guest.

Our future depends on getting the fundamentals right. And that means modernizing supply chain. It means enhancing our technology, taking complexity out of our systems, elevating the use of data and driving productivity savings across the entire business.

John Mulligan will be the very first to tell you this doesn't sound like the sexy stuff, but these are the things that make Target work. These are the building blocks for our future and these are the things that will drive growth at Target for years to come.

So we've said many times that, for us, transformation starts with the guest. It starts with people like Anna, every decision, every action, putting the guest at the center of everything we do. And right now, I don't think we've ever been closer to understanding, truly understanding what our guest expects.

Not long after I arrived at Target, it was clear we've been spending a lot of energy, a lot of resources on guest research, but we really didn't know the guest. While different teams across the enterprise have been working to improve the guest experience, they've all been doing it through an individual lens. No one was looking at this from an enterprise standpoint. So we established our first-ever guest center of excellence, which brought together all the teams, all the insight teams across the Company.

Now Carolyn Sakstrup, who leads this effort, certainly brings a unique vantage point to the job. Before taking on the role, Carolyn took this guest first challenge to heart. She and her family of four only shopped at Target for a year. That's right, for a whole year. And then blogged about the things we got right and things we didn't. Let's take a look.

(video begins)

---

**Carolyn Sakstrup** - *Target Corporation - VP, Guest Center of Excellence*

My family and I attempted to shop only at Target for an entire year. The inspiration was to see how much money we could save and I knew almost immediately that saving money was not actually the purpose of the year. The purpose of the year for me was to be able to get closer to our guests and what they experience on a daily basis.

My relationship with Target in that year as a guest fundamentally changed. So here I am in the store feeling like I know this place better than I ever have, but the place doesn't know me in any different way than a guest who comes in once a year. The only way to know more about our guest is to get to know our guests.

The overall mandate of the guest center of excellence is to help instill guest centricity for everyone who works at Target. We aspire to enable all of our headquarters team members to have more empathy for our guests. So we have conducted guest immersions. What that looks like is one Target executive, one interviewer, one guest, three hours. We sit down and say tell us about yourself. Tell us about your family. What does a typical day look like?

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



**THOMSON REUTERS**

**MARCH 02, 2016 / 7:30PM, TGT - 2016 Target Financial Community Meeting**

And what you hear from all of this is you hear the stories that the guests choose to tell. We have to make our decisions in the context of our guests' lives and the context of our guests' lives will constantly be changing. The work is not done. The work will never be done.

So an example, in style, we (technical difficulty) position ourselves as our guests' style accomplished. What we learned was guests are not looking to Target to be the advisor or accomplice or that person who they are going to look to like they would a friend or their social network. Our style guests have a strong sense of their own style. They want a place where they can bring that to life.

Very often we write our objectives as what will Target get and having these conversations with guests puts people in the mindset of what will Target give. What can we give that will give the most to these guests who we just talked to and simultaneously, almost as like a nice side benefit, do the most for us competitively because we are talking about an opportunity space where we are best positioned to meet the needs of our guests.

(video ends)

---

**Brian Cornell** - *Target Corporation - Chairman & CEO*

Over the past several months, we've met with hundreds and hundreds of guests and for me personally, these immersion trips have been an invaluable window into the lives of the folks who shop our stores and sites and also those who don't. And there's no better way to understand what makes our guests tick than sitting in their living rooms or standing next to their kitchen sink. And when I walk into someone's home, they don't know I'm from Target. They certainly don't know I'm the CEO. They just know my name is Brian and I'm there to try and understand how retailers can do a better job of making their lives a little easier.

And that's where the truth starts to come out. When we asked them about their favorite retail brand, I can tell you nothing lifts our spirits more than when they say Target. But on the other hand, nothing cuts deeper than when you hear we are letting them down. And sometimes we hear both. But with each visit, we are walking away with new insights. Sometimes it's clarifying a simple nuance. Sometimes it's a really big provoking shift in our thinking. We thought we knew the guest. We really thought we knew the guest, but we've gained some valuable new lessons.

For example, we used to use the term you heard it last year, on demand, when we talked about the guest expectation in the digital world. Turns out that phrase does not connect with the guest. When we say on demand, they think about their cable box, not retail. But it's bigger than just getting the terminology right. It's really important that when we talk to the guests, they understand that we are listening to them, that we hear them, that we are not just talking past them. It's a really big difference. And we will continue to listen to our guests and draw these insights to further shape and refine every aspect of our strategy today.

So I recognize this is an election year. Last night was Super Tuesday and I'm going to steer away from anything to do with state-by-state results. But I will tell you that this year, at Target, we are placing our bets in California. This spring, we are taking 50 of our top enhancements that we've been testing across the country and putting them together in 25 stores in Los Angeles. A pilot we are calling LA25 and the goal is to see how we can improve the guest experience and grow sales when all of these elements are working together.

We are making product improvements the hero with more impactful presentations, fixtures and signage. We will make it easy for the guest to pick up online orders with dedicated service stations. Guests will see a floor pad filled with reinventions across the store. One of the things we were hearing loud and clear during our immersion visits is that there's absolutely no substitute for human interaction. A genuinely helpful team member can literally save the day or at least save the sale.

So as part of the test, we are adding more specialized team members to pilot more personalized services. We know a trusted advisor can let a guest know how many gigs they really need when picking out a new iPad, or which moisturizer is the right one for them if they have sensitive skin.

We are also rolling out a new team of digital service advisors to help our guests get the most out of Cartwheel and Target.com. Looking ahead, we will take everything we learn from LA25 and apply it to the designs for our next generation prototype store. But we won't wait until we ramp up LA25 before we take the proven winners and roll it to the rest of the chain.

5

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.


THOMSON REUTERS

For example, when it comes to style, our guests say context really, really matters. They need help seeing how items fit together. Right now, we are already deploying visual merchandising leaders to tell product stories and customize in-store presentations. Another prominent enhancement is Bullseye's Playground. We've already repositioned the front of the store as a family-friendly showcase for seasonal items. It's the exact same space, the same price points as the old section, but we are already seeing more than 25% growth in a large and very profitable part of our store.

Just last month, we were honored when FastCompany called Target one of the most innovative companies in retail for using our stores as laboratories and you can expect we will continue to keep testing, learning and iterating in the year ahead.

Now, by any measure, Cartwheel is a success story many times over, 22 million plus downloads, $3 billion in sales. We know our guests love the thrill of a great deal. But as you know, Cartwheel is just one element of what today amounts to a piecemeal loyalty strategy that includes our REDcard and REDperks, which we've been piloting in North Carolina.

We believe we can simplify the whole experience. We believe we've got a huge opportunity to identify more guests and bring them a broader rewards portfolio. We are focused on acutely understanding the guest lifetime value, getting to know them more deeply, their attitudes, their preference, their behaviors and then give them more personalized experiences and more personalized promotions, all in service of finding that sweet spot. What do we need to offer to make sure that guest chooses Target again and again?

We've hired Keith Colbourn as our new Senior VP for Loyalty and Lifecycle Marketing to lead this effort and while it's early days, I can tell you Keith is off to a great start.

Another key priority this year will be continuing to implement clear category roles. Now, you don't need to be a golfer to know you'd never want to play a round of golf with one club. You keep 14 clubs in the bag and every one of them, they count. A driver can take you hundreds of yards off the tee, but it's generally useless in the sand. A good player, well, she uses her putter more often than anything else. Every club has a different role.

And we look at our merchandising categories the same way. We will never be famous for selling bottled water or laundry soap, but we've got to have the right brands, the right pack size and we have to always be in stock because we know these items are key, they are essential to that Target run.

But we also know there are four categories, categories we've deemed signature businesses, where our guests want us to play and inspire them -- style, baby, kids and wellness. They represent about a third of our business and we are putting significant resources behind them.

In 2015, those signature businesses grew 3 times faster than the rest of our assortment and today, we are expecting aggressive growth as we go forward into the future. But there's also important insights that are coming back from that guest. We shouldn't think about each one of these categories as independent trip drivers or the singular reason why a guest chooses Target. Our guests have multiple categories on their lists, so the power behind our strategy is that we have to stand behind all four of these. Our job is to make sure we give the guest every reason to shop, discover and explore each of these signature categories.

And here's just a few highlights of what you can expect. When we are playing at the top of our game, there's no greater manifestation of our brand promise than our style categories. So we've made big investments to elevate product and improve presentation in all of our channels and the strategy is paying off. The results for our home business in 2015, for example, were the strongest we've seen in the past 10 years. And given the long leadtime and production cycle in these businesses, our guests are going to continue to seek marked improvements in quality, in our own brand home and apparel throughout 2015.

While our teams work hard to stay out in front of trends and offer guests a variety of aesthetics in every collection, we are also going to continue to innovate and reinvent our design partnership model that we pioneered. Just in January, just a few months ago, we teamed up with the founders of fashion site WhoWhatWear to co-create a fresh style collection. Each month, we will update that collection using social media feedback from our guests and I can tell you this line is off to an exceptionally strong start, selling twice as much product as we expected out of the gate.

6

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.


THOMSON REUTERS

**MARCH 02, 2016 / 7:30PM, TGT - 2016 Target Financial Community Meeting**

As you know, our teams travel the world seeking design inspiration. They are always on the hunt for new partners we know our guests will love and for those of you who caught Good Morning America today, you saw some really big news. This season, we are pairing with another amazing brand, a Finnish design house made famous for their bold, eye-catching prints. Marimekko for Target, which will debut in April, will include a collection of more than 200 items celebrating the possibilities of Scandinavia's endless summer nights. Now we can only offer you a sneak peak, but I can absolutely assure you our guests are going to love the unexpected nature of this partnership.

Last year, we bet big on swim, both in digital and in store and we are seeing those investments bear fruit. We reclaimed our number one spot, the number one marketshare position in swim and we've grown the business 15% over the past two years. We think we will make a splash this season with terrific assortment, exclusive items and a campaign that celebrates style and inclusivity.

So far, we are really encouraged with the early results in digital, which sets the tone for the rest of the season. By any measure, we are really pleased with our performance in kids, but we know better to mistake good performance for potential and we think there's tremendous opportunity here for new growth. This year, we are introducing a pair of amazing new brands and we've taken our guests and their kids as partners every step of the way. Let's take a look.

(video begins)

---

**Julie Guggemos** - *Target Corporation - SVP, Product Design and Development*

When we decided to develop a new kids brand for home, we really wanted to involve our guests -- moms, dads and kids -- to find out what they really want and what inspires them. I am Julie Guggemos and I lead Target's internal design team and I am thrilled to introduce Pillowfort. We did a lot of research to develop this line, so this is a brand we truly co-created with our guests. We had them vote on the print and pattern. We had them vote on their favorite pieces.

What we heard from moms and dads alike, they want their kids' room to feel like an extension of their home. When we talked to kids, we found out they are fearless. They want to express their individuality and they are not afraid to reflect their personal style. Pillowfort is 3 times bigger than our current kids line. It's well designed, it's high quality and best yet, the value is unprecedented in the market.

All of Pillowfort's designs can be mixed and matched so every kid can truly make their room one of a kind. We are starting with Pillowfort and then in the summer, we launch with our new brand for kids apparel called CAT & JACK. In 2016, we are putting Target on the map for kids and I am confident that parents and their kids will absolutely love it.

(video ends)

---

**Brian Cornell** - *Target Corporation - Chairman & CEO*

We believe Pillowfort has the potential to double our kids home business over the next three years and I can tell you I personally love this brand and I think our guests are going to love it too. In fact, this weekend, we are hosting an interactive experience on the Highline Stage, about a mile from here and we are inviting guests to come play and have some fun with this new brand.

And while it's still too early to reveal too much about CAT & JACK, which will launch in June, we think this has the potential of being a multi-billion dollar brand and could help us grow twice as fast as the industry average. These brands are just a couple of the examples of the phenomenal work coming out of our product design and development team and that team for a long time has been a huge competitive advantage for Target.

What really makes this team tick is the way they put the guest at the center of the design process and build their teams to include a wide and very diverse set of experiences. Our teams include textile engineers, sustainability experts, trend spotters, even philosophers who develop products that make guests' lives feel better. Julie Guggemos is sitting right up front here, who you saw in that video, is here today to give you a firsthand look at the work during the reception after the presentations.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

 THOMSON REUTERS

**MARCH 02, 2016 / 7:30PM, TGT - 2016 Target Financial Community Meeting**

Last year, we also put a stake in the ground around wellness. We've had a unique opportunity to use our scale to help our teams and our guests eat better, be more active and find cleaner label products. As a category, wellness continues to outperform the industry. But as you know, wellness is a very crowded space. The key for us is to focus on offering differentiated merchandise and solutions and experiences in a way only Target can.

So this year, we will lean into programs like Made to Matter. We will continue to pursue partnerships with other great brands, like we paired up with SoulCycle for a 10-day city tour -- 10-city tour that we kicked off right after the new year. We saw a big opportunity to evolve our C9 activewear and the early read on our performance is really strong. And we will bring new food options into our Target cafes with some new partners. But during the year, you'll see wellness play a more prominent role in our corporate and social responsibility efforts in communities around the country.

All right, so I know all of you are eager to hear us talk about our plans for grocery. At $18.5 billion in sales, it's already a huge business for Target and last year, we promised we'd redefine our position in food. While our guests certainly have told us they appreciate the convenience of having fresh foods, we also heard that too often they were leaving underwhelmed and disappointed.

So over the last 12 months, we've talked to guests, we've certainly assessed our competitive set. We've done deep dives into the business and we've been tearing down every category and every process. What we quickly realized, the deeper we dug, the more fundamental challenges we found. We know repositioning food is going to be a much bigger task than just reconfiguring part of the store.

Looking across categories, we found out our marketshare was out of balance. We were strongest in the categories with the least growth potential. Too much of our assortment is in the center of the store while the true growth opportunities exist around the perimeter. We found we were touching product far too often, driving up operational costs and complicating our out-of-stock position.

The bottom line, until we address the fundamentals, things like consistency and reliability that start with offering fresh produce, our guests won't give us credit for the overall progress we are making. So we are doubling down on food fundamentals. And we know, given where we are starting, given where we are today, we've got lots of room for growth and while this won't start with a big, one-time reset, a one, big-time reveal, we think we will transform virtually every element of the business.

This year, you'll see us working to earn more credit for organics and dramatically improving freshness across the assortment. We are moving through the assortment item by item, starting in the fields and carrying it all the way to the sales floor. We are also focused on driving penetration with our own brands, including the newly relaunched Market Pantry. And we brought in a lot of external talent. They are also laser-focused on business basics. They are focused on assortment and pricing and promotion and presentation and they've zeroed in on those key seasonal moments when we absolutely need to shine.

And the good news, the strategy is working. Our guests are noticing a better experience every time they shop. They are noticing that we are adding more organics, more specialty items, more exclusives. They've noticed that freshness is improving. Overall, our comps in grocery outpaced the rest of the store in both the third and again in the fourth quarter.

It's a big turnaround after lagging our overall performance for several years. We know grocery is highly complex, but it's also very important to our guests and there's a ton of work going on right now behind the scenes that you will never see, but we look at each and every day.

Importantly, as our business continues to perform, we know our guests are voting with their feet and they are telling us that we are heading in the right direction. But turning this business around will be a multi-year effort and it's not going to be easy. But our teams' mantra overall is that it's better to get it right than to get it done fast and that's the approach we are going to take as we move forward with food.

So we've spent a lot of time today talking about the fundamentals and the things we need to do to position Target for the future. But I think everyone in this room would agree the path of long-term prosperity must include a renewed commitment to innovation, creating a culture of curiosity and exploration within our organization.

I can tell you innovation is in our blood. It's part of the Company DNA. But we have to put the right conditions in place to encourage innovation and allow it to thrive. So we've intentionally assembled a small, but mighty team and asked them to think well beyond the box. We've hired experts.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

 THOMSON REUTERS

We've brought in entrepreneurs in residence, people with a proven track record of success. Their jobs are to hunt down new ideas, forge new partnerships, teach our teams how to bring new products, solutions, brands and business models to market. Their pursuits are tightly aligned with our signature businesses and laser-focused on driving profitable growth for our core.

You might have seen the coverage of our partnership with IDEO and MIT's media lab around the future of food. The reason we are doing this, well, it's simple. We are operating almost a $20 billion food business and we know we haven't tapped the full potential. We need to understand where the market is headed and we need to ensure we get there first.

You'd be hard-pressed to find a better use case for the Internet of Things than in a baby's nursery. But we owe it to our guests to curate the best products, wade through all the digitally-enabled gimmicks that are out there and find items that actually solve problems.

So our team is taking a portfolio approach and our investment strategy will continue to be highly disciplined, but we are also giving this team a little room to run. Some of the bets will pay off over the longer horizon, but some will start showing up in our assortment in a matter of months.

Of course, these are just a few initiatives that we have underway in 2016. We've made lots of progress, but as I've said many times now, we know we've got a lot of work left to do. So in a moment, John Mulligan will share more details around the fundamentals and Cathy Smith will walk you through a careful analysis of our 2016 algorithm.

But before I go, I want to make it clear. The path we are laying out today is a path for profitable growth and this is how we are going to build the foundation to sustain it. So let me turn it over to John who is going to walk you down that path to profitable growth in the future. John.

---

**John Mulligan** - *Target Corporation - EVP & COO*

So you just heard from Brian that this part of the program isn't about the sexy stuff. Fair enough. Unfortunately, for all of you, I'm afraid I'm about to make you -- demonstrate to you exactly what he meant by that. But what Brian also said and what I firmly believe is that Target's future rests on getting the fundamentals right.

Over time, we've been adding stress and complexity to systems that frankly were built for another time to keep pace with our changing guests, to consistently deliver what our guests expect and position Target for the future, we must zero in on critical pieces -- supply chain, stores, technology -- and put our guests at the center of all of it.

For 50 years, we were working off a pretty linear system. It started by moving product from our vendor partners into distribution centers and then out to our stores. The whole system moved from the left-hand side of the page to the right. Today, the world couldn't be more different. Today, guests can still shop our stores to get the products they need and even pick up a few they didn't know they wanted. But they can also shop online and have the order delivered to their home or in the case of Anna planning a birthday party on the train, they can order online and pick up in store without missing a beat. Our guests are calling the shots and we want them to do just that.

We continue to send product to stores to support an in-store shopping experience. But we are also shipping directly to guests from stores, DCs, even vendors and we are sending products to stores for online order pickup. In fact, the number of Target.com orders our guests chose to pick up in stores grew by 60% in the past year, almost double our full-year digital sales growth. And sure, overall digital demand is growing, but this also reflects our guests' increasing desire for the convenience of picking up their orders in store, usually within the hour.

All these changes are in the name of making sure we can deliver the products our guests want fast. In our stores, they are more important than ever. They've become showrooms, fulfillment centers and pick-up locations. And the people inside them are there to help.

Sounds great, right? But here's the rub. We can't continue to add this kind of complexity without ensuring the foundation can support it. Earlier, you heard a little bit about our guest immersion experiences and I can tell you from my own guest conversations that Brian's summary was right on. Hearing from guests was both uplifting and humbling to realize how much they love us and how much work we still have to do to deliver the experience they expect.

9

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.


THOMSON REUTERS

**MARCH 02, 2016 / 7:30PM, TGT - 2016 Target Financial Community Meeting**

We've talked to guests all over the country, but let me relay what I heard from a young man in Chicago, a newly engaged millennial sharing his first apartment with his fiancee. He didn't think about a store experience or a digital experience, whether he is making a Saturday morning Target run, browsing Cartwheel offers or making his list on our mobile app, he thinks of it as a Target experience. And he's not unique from so many of our guests. We have to build our operations through that lens where channels don't matter and our delivery is seamless regardless of what the guest chooses.

Fortunately, we already have an arsenal of assets that work to our advantage. We have 40 well-positioned distribution centers, a widespread network of 1800 stores and a team that knows the business and the guest. The main task ahead of us is modernizing how we put those assets to work in ways that help us meet guests' expectations now and well into the future.

And that's where my team's work begins. I've been in retail for nearly 20 years and I have walked thousands of stores and here's a secret a lifelong numbers guy never wants to admit. You don't even need to look at the data to determine the operational health of a store. I'm not giving you permission to do this, but all you have to do is poke your head in the back room. If it's well-organized and relatively empty -- simple, A+. If it's packed full of product, we've got a problem on our hands because ironically lots of inventory typically correlates with lots of out-of-stocks.

So in the past year, we've put a lot of thought into tackling these challenges and we found it doesn't necessarily require investing in new, but often entails using what we have, like systems and talent, more effectively to deliver a better experience to our guests. To reduce back-room inventory, we are redesigning shelf presentations to put even more product on the sales floor and surgically reducing the number of SKUs in particular categories. We are also optimizing case pack sizes to get down on the number of times our teams are touching a product.

Imagine for a minute that a store receives 24 jars of peanut butter in a case, but the shelf only holds 18. So instead of being able to pull a case pack directly from a delivery truck to the sales floor, teams have to break open the package and store the extra six jars in the back room. And as soon as we sold through the shelf, they have to make an extra trip to the back to replenish. You don't need an advanced degree to see the math on that scenario is not good. Three times the touches and a huge drain on payroll productivity. So we are working with vendors to send case-pack sizes that match each product's rate of sale and allotted shelf space.

When you talk to our guests, the number one pain point is that we are out of stock and when it's for an item we've promoted, it's a double whammy in disappointment. We've offered a great deal, they came to the store and when they got there, they couldn't buy what we said we would sell them. So we established an action team last summer that has been digging category by category into the root causes of persistent out-of-stock challenges and the results have been very positive. We finished 2015 with out-of-stocks 40% lower than the year before. And for a set of focus items we've designated in essentials, our out-of-stocks are better than we have ever measured.

On top of that, those results came from process changes that are simple, repeatable and sustainable. So in many cases, we can apply the same fixes across the business. What we've done to reduce out-of-stocks in paper towels, for instance, is working for us in diapers, given they are both high frequency, large pack size products.

The solutions we've started to put in place are helping to address some of the fundamental issues, but we've uncovered other parts of our operations that need more fundamental change. It was clear we needed a dedicated team that could focus on transforming our supply chain to lay the foundation for tomorrow without the burden of the all-consuming responsibility of running day-to-day operations.

As a result, we carved out a small team last fall comprised of functional experts from across the organization and we asked Karl Bracken to head up this effort. He had led several parts of our supply chain and merchandising functions and set up our flexible fulfillment capabilities. After identifying a long list of work we could tackle, the team narrowed on a focused set of priorities that would have the biggest impact.

For example, work is already underway to solve for the variability of when our products arrive in our distribution center. Some products arrive late, some products arrive early and in general, the windows we specify for our vendors are far too wide. That inconsistency upstream makes it harder to keep our stores in stock or provide tight shipping windows downstream.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



**MARCH 02, 2016 / 7:30PM, TGT - 2016 Target Financial Community Meeting**

And we are working with merchants to change planogram designs, cutting the number of times we have to replenish our fastest turning products, which reduces out-of-stocks and the amount of inventory needed in our back rooms. Ultimately, the biggest opportunity is to optimize how we forecast, allocate and replenish products across our supply chain.

Years ago, we knew exactly how to plan for in-store demand and move product to the right store at the right time. As we've started to use our network in many different ways, fulfilling guest orders that come from a variety of channels, we've needed to improve how we plan and move product so that it's ready as soon as the guest needs it. Nailing this core part of our supply chain operation will unlock incredible growth potential.

There's a lot of great work underway and we are pleased this week to announce a new leader of our global supply chain operation who will bring proven experience and fresh thinking to help build on our progress. Arthur Valdez will join our team later this month as EVP and Chief Supply Chain and Logistics Officer. He has spent his more than 20-year career in operations for a variety of brands and products, but comes to us most recently from Amazon where he led the company's international supply chain expansion and worldwide logistics function.

Based on his background and my conversations with Arthur, there's no better way to describe him than a creative supply chain strategist. He has designed efficient, cost-effective and fast operations and developed innovative ways to move product closer to the consumer. His expertise and proven track record have signaled that he's the right person to help move Target forward and I can't wait for him to come onboard.

While our teams are focused on the entire supply chain, we are also paying specific attention to food. Brian mentioned our evolving grocery strategy and our teams are adjusting our operations to support that vision. As part of that effort, we've brought in experts to assess our fresh food supply chain and are dedicating new resources to raise the bar with in-store presentation.

At the same time we are working to shore up the fundamentals, we've also begun to develop smarter ways of using our distribution network to move product to our guests. For years, we've used our regional distribution centers, or RDCs, to send frequent shipments in bulk only to stores. And we used our online fulfillment centers to ship individual Target.com orders directly to guests.

But, today, we are blurring those lines of distinction. Internally, we've integrated our digital in-stores inventory systems so we can look at where we have product across our network and fulfill an order using merchandise that's closest to the guest who placed it regardless of what type of building it's in. We recently equipped one of our RDCs to send Target.com orders to guests and will add that capability to more buildings throughout the spring.

The ability to use product that's already close to the guest improves our delivery time and reduces our shipping costs. Good for guests and good for business. As we add more capabilities to our DCs, we are also turning three of our existing buildings into warehouses for slower turning, more seasonal products that have variable purchase patterns like apparel. Storing that type of merchandise separately clears the way to process our fastest turning product even quicker, while also giving us the ability to pulse the right amount of seasonal product to the right store at the right time based on real-time demand.

The advantage we get from adding these special nodes to our network is certainly related to reliability, but also enables us to be more agile in how we respond to guest demand. Take rain boots. Sales are dramatically impacted by weather patterns and while we know we will sell more in Seattle than Arizona, exact quantities are much less certain. Rather than pushing out a predetermined amount of product to all of our DCs around the country, we can store rain boots in a DC designated for seasonal product and ship the right amount to the areas of the country where they are needed as they are needed.

This winter, California has seen a lot of much needed rainfall. Rain boots and umbrella sales are much higher than we had predicted a year ago. By keeping product like this separate from our fast-moving network, we can more easily move additional product to California rather than leaving it in hundreds of stores' back rooms and avoid markdowns in areas where demand is lower than expected. Last month, we opened the first of our repurpose buildings in Rialto, California and have announced plans to open two more, one in Illinois and one in Virginia, this spring.

When you think about the things that Target -- that give Target our most significant competitive advantage, you'd have to put our nearly 1800 stores at the top of that list. And while there is a lot of talk about the future being digital, physical stores still account for more than 90% of all retail

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



**THOMSON REUTERS**

sales across the industry. For Target, we have no doubt that our stores will continue to be a key differentiator well into the future. We just need them to serve our guests in a new way. In fact, our stores filled about 30% of our total Target.com sales in 2015 and nearly 50% of our digital electronic sales in Q4.

Ship from store, when we ship a Target.com order from our store back rooms, is the flexible fulfillment options that's seen the most growth in the past 12 months. A year ago, we were shipping online orders from fewer than 150 of our stores. This fall, we more than tripled that, meaningfully producing transit time and putting us within a two-day delivery time for 99% of US guests with store-eligible items. And we plan to increase our capacity to ship even more orders from these locations in the future.

Today, these capabilities are capturing sales we otherwise would have missed without needing to build any new distribution centers. In fact, more than a third of last year's ship-from-store orders saved a sale when our fulfillment centers were out of stock. Here's a closer look at how it works.

(video begins)

---

**Unidentified Company Representative**

Ship-from-store is a win for Target because we are able to leverage assets that are already well-positioned in our supply chain. Our stores are already close to our guests. When we first started shipping from store in 2014, we rolled it out to 133 stores. Over the course of the last year, we are now shipping from more than 450 locations.

It all starts with the guest placing their order on Target.com. Then we have an order management system that figures out the best way to fulfill that for our guests. If the store is the best way to fulfill that order, it comes into the fulfillment application that the team members access on their handheld device. The system will automatically lead the team member on the most productive path through the store. Once the team member is done picking the orders, they bring it back to the pack-and-ship work station to securely pack the items for the guest. Once they complete packing, they stage the items to await carrier pickup. This process is completely invisible to the guest. All they know is that they are getting their online orders faster than ever before.

(video ends)

---

**John Mulligan** - *Target Corporation - EVP & COO*

As we continue to place higher expectations on our stores, we need to keep investing in people, processes and technology that help them do a job. As Brian mentioned, our LA25 pilot is testing improvements to the order pickup experience, but we are also making enhancements across the chain, rethinking the store layout and the technology systems, as well as simplifying the backend operations to reduce workload for the team.

We hear this all the time. It's the in-person interaction with Target's team members that can make the in-store experience so valuable. Which iPhone model is on sale? How do I pull these home decor pieces together in my own space? I bought the wrong size sweater online, can I return it? Here let me show you or, yes, I can help you are some powerful words and go a long way in making it easy for our guests to get what they need.

As we are working to move product more efficiently, we also have to remove some of the operational tasks so teams can spend more time helping the guest with those questions. In fact, the work we are doing to improve out-of-stocks and reduce back-room inventory is already showing big potential to help those in-store team members to devote more time to service than checklists.

As we follow through on those initiatives, we were excited to bring Janna Potts and her more than 25 years of experience in managing our field operations and leading our teams to the helm of the stores organization. Janna and team are designing a strategy that will shift a one-size-fits-all approach to service in every category toward elevating service levels in our key growth areas. And overall they are focused on making it easier for our teams to find guests as soon as they need something instead of waiting for the guest to even ask the question.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



**MARCH 02, 2016 / 7:30PM, TGT - 2016 Target Financial Community Meeting**

Now let's talk about a topic you all know well. Our guests more and more are choosing to live and work in cities and if you know an undeveloped 10-acre site in Manhattan with a couple hundred parking spots at a reasonable cost, let's talk because sites like that simply don't exist. So we are testing more flexible formats designed to bring Target closer to our urban-dwelling guests. In 2015, of the 15 new stores we opened, 9 of them were flexible formats. We put a Target in Chicago's Streeterville, not far from Navy Pier; in Boston, with actual sightlines into Fenway Park; and we just announced a future store about a mile from here in Tribeca.

It's not overselling it to say that our guests really love these stores and not just because they love Target. We hear over and over again that it's because of the care we put into building unique assortments made to order for their neighborhoods, neighborhoods with young families who want diapers and birthday decor, office workers who want snacks and grab-and-go meals. College kids solo cups and ping-pong balls. And by the way, whether you understand that last combination is likely related to your age or the age of your kids.

We are also paying attention in these markets and making changes to assortment and presentation like setting endcaps with water bottles, coolers and expanded game day merchandise in our Boston Fenway store just in time for this year's opening day. Let's take a look at Streeterville.

(video begins)

---

### Unidentified Company Representative

We are in the Streeterville neighborhood of Chicago, most famously known for Navy Pier and Michigan Avenue. Even though there is a lot of tourism in the area, there's also a lot of residents that live in condos and high-rises. When you walk in the store, you'll see exposed brick walls, wooden beams that's very unique to the building and the history of this neighborhood.

As you shop our store, the products that we have are very localized whether that be craft beer, Chicago sports teams or our partnership with apparel designer, Todd Snyder. Something that is new at our location is Starbucks Evenings. What you will find is an expanded variety of food options, as well as beer or wine.

Our guests that shop at our store are usually walking on foot or traveling by the train or the bus, so you'll see a lot of grab-and-go options, as well as a lot of healthier snacks knowing that our guest is really looking to live a healthier life. We've been really open to our guest feedback. From that, we've been able to refine what our guest is looking for so when they come and shop at our store, it's their Target. It's what they want. It's what they need.

(video ends)

---

### John Mulligan - *Target Corporation - EVP & COO*

And while the in-store experience is carefully designed to fit a variety of sizes, even down to 10,000 square feet, services like order pickup and ship-to-store put the entire Target assortment within reach and turning these stores into urban fulfillment centers.

Flexible fulfillment makes shopping at Target even more convenient, especially for a guest who would rather not have a new iPad sit in the foyer of their eight-unit apartment building all day long hoping it's still there when they get home from work. And it brings new guests into our stores.

In addition to concentrating these formats in urban, densely populated areas, we also see big opportunities near college campuses. Guest research tells us college-age students already love our brand and want to be able to shop our stores and market research shows us that the lack of overall retail options on and around campus from basic apparel to fresh food is a real concern. Our campus strategy allows us to better serve a particular market while also building a stronger relationship with guests at a critical life stage. These students are newly independent adults on the verge of becoming our core guests, digitally-minded millennial families who love to shop.

13

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

 **THOMSON REUTERS**

**MARCH 02, 2016 / 7:30PM, TGT - 2016 Target Financial Community Meeting**

Our first foray into campus life started with a test near the University of Minnesota. Since then, we've opened new stores near Berkeley, USC and the University of Maryland and in 2016, we will be at Penn State and near several colleges in Boston with more to come in 2017.

So I've spent a lot of time today on the big physical stuff, supply chains and stores, but the technology that keeps it all humming is just as important. It's the central nervous system of our entire operation. So to enable the changes we are putting in place, we need to make the right investments, working in close collaboration with our CIO, Mike McNamara.

Last year, we were thrilled to bring Mike on board from Tesco, which has some of the most sophisticated retail infrastructure in the world. And he has a very clear philosophy on pursuing fewer, more impactful projects so his team can accomplish substantial results in a shorter period of time.

Case in point, our in-store service tool. A year ago, when a team member needed to look up a product or answer a guest question, the system would crash far too often and that meant the guest was out of luck. Safe to say the tool needed significant improvements in stability. Mike's team zeroed in on fixing this and within a few months cut the number of incidents in half.

Across the Company, Mike and his team are prioritizing investments and systems that help our supply chain better forecast and allocate product, enhancing the back-end functionality that enables us to grow our flexible fulfillment options and continue to build our available to promise technology to give guests a clear view of inventory and delivery timing.

And as we learned from our incredible success during Cyber Monday, with traffic more than 2 times what we planned, we have an opportunity to serve even more guests as digital demand continues to rise. So just as we are building an operational foundation for the future, we are making sure to build the capacity to support digital growth.

I've talked a lot about some of our specific priority areas, especially within the supply chain. But, across the organization, we are applying a focus on being more efficient so we can be more effective. This fall, a proven industry leader in operational excellence, Anil Gupta, joined Target to improve how we operate as an organization. Her team is partnering across the Company to build a consistent lean process culture and they've focused on improving some of the highest impact work within the business such as designing processes that increase our inventory accuracy so we can fulfill even more of our guests' orders, or planning promotions that are both meaningful to our guests and support profitable growth.

We are in the early stages, but I'm really pleased with the team's initial progress. For example, after just a few months on the job, we've already reduced the number of steps it takes to add new product to our inventory. You might think that sounds like small potatoes, but we set up tens of thousands of items every year and making sure it's done fast and done right is critically important. Dimensions, attributes, weight, color, pack size, it all has to be exactly right, especially because it affects every aspect of a guest's journey from how our store teams find helpful product details, to the quality of our site search function, to how we ship guests' orders.

In the short time since they formed, Anil's has simplified this core task while also improving data integrity, bringing benefits to the guest experience, as well as our business. This is only one example of the many ways this team is working to make our operation more productive, cost-effective and efficient.

As we are putting our existing assets to work in new ways and building capabilities we need to support continued growth, we are setting the foundation to help us deliver an unparalleled guest experience, no matter what the future holds for retail. Our priorities and vision are no longer just a strategy. We've moved from conceptualizing what we need to do to putting that work in motion. We are becoming more agile. We are increasing reliability and we are simplifying the parts of our business that are unnecessarily complicated.

We are building the bedrock for innovation and sustainable growth, not only for today, but well down the road. And now that you look at it and how all of this operation will work will unlock future growth for Target, I think it is actually kind of sexy after all.

With that, I will turn it over to Cathy to talk about our financial performance and long-term goals.

14

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

 THOMSON REUTERS

**MARCH 02, 2016 / 7:30PM, TGT - 2016 Target Financial Community Meeting**

**Cathy Smith** - *Target Corporation - EVP & CFO*

Thank you, John. At this meeting last year, Brian and John first presented our strategic plan along with the details of our financial algorithm. Obviously, after I arrived, one of my first priorities was to work with the team and immerse myself in the details of our business plan and financials. As a result of our work, I'm very confident that the plans we have in place today will allow us to continue to deliver on our goals just like we did in 2015.

Not that long ago, growth in retail meant adding a lot of stores. Today, our growth plans are focused on using the assets we have differently. And at Target, we are fortunate to have many great assets to build upon. We have one of the strongest brands in the world and a unique relationship with our guests. We have 1800 well-located, well-maintained stores that are fun to shop. We have a guest-focused team both at headquarters and in our stores that differentiates us from all other companies, not just retailers.

Our product design, development, sourcing organization keeps us ahead of the trends and allows us to offer beautifully designed, innovative and fashionable merchandise at an amazing value. And we have built an impressive array of owned and exclusive brands, many of them $1 billion brands that are guests love and trust.

Target has an enviable set of assets and our growth plans today are focused on using all that is Target to serve our guests in new ways and more reliably. Brian and John have already taken you through a host of initiatives we are pursuing to continue delighting our guests, which will drive profitable growth for Target. And I can tell you, after reviewing each of these initiatives in detail, I am confident they will support our growth consistently and our goal to deliver a 3% plus comp sales growth.

In our signature categories, we see amazing potential in our two new kids brands, Pillowfort and CAT & JACK. Specifically, we believe that Pillowfort has the potential to double Target's sales in the category over the next few years and we expect CAT & JACK will become one of our biggest brands.

In food, just think about the opportunity that we have in front of us. If guests who already shop our food assortment added just one extra food item into their baskets, we would see billions of dollars of incremental sales. With the sale of our pharmacies and clinics to CVS, more than 80 million members can now -- of their PBM network -- can now fill their prescriptions in a Target store. And even if we capture only a fraction of their pharmacy visits, we will increase traffic into our stores.

Based on our initial work to create a more seamless and holistic loyalty program, we believe we have the potential to double the number of guests we are reaching with our loyalty vehicles today while deepening our relationship with our guests.

Let's look at the benefit of reducing out-of-stocks. Consider this example from the holiday season. About 40% of our digital orders fulfilled by our stores consisted of items that we were out of stock in our Web fulfillment centers. This allowed us to preserve sales we would have missed without the access to our store inventory.

In our Chicago test last year, we demonstrated the potential from localizing a store's assortment to fit its neighborhood and we saw a 1% to 2% sales increase in those test stores. As a result, we are making changes to our systems and processes that will allow us to scale our work in Chicago, more broadly harnessing this potential overtime.

And finally, we are in the early days of realizing the potential from our new flexible formats. We have a huge opportunity of untapped markets we can reach with these new stores, bringing Target to new guests and new guests to Target. Each store is made to order with a unique assortment tailored to its neighborhood. I have visited several of these stores around the country and I'm always impressed by how they continually test and learn and actively seek feedback from their guests. For instance, in our downtown San Francisco store, they've added more healthy grab-and-go snacks and more party supplies in response to guests in nearby office buildings.

In addition to these initiatives, digital will continue to play an important role. As you know, more and more often, guests start their visit to Target on a mobile device. They research products and prices on our site or a mobile app and on social media platforms like Pinterest. They make lists, order items for store pickup and search for coupons and explore Cartwheel. They do this before and during a trip to one of our stores.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



**MARCH 02, 2016 / 7:30PM, TGT - 2016 Target Financial Community Meeting**

Our guests want a great Target experience in all the ways they interact with us regardless of how they choose to transact with us. This means we will continue to invest in digital capabilities that will help our team members to better serve our guests and enable our guests to seamlessly experience Target. All together, we have a powerful set of growth initiatives that we will continue to pursue in 2016 and beyond.

Some of them, like category roles, have already proven their ability to shape our business results and others are still in early stages, but they have some common elements. They start with a focus on our guests, they leverage modern retail fundamentals, they incorporate digital capabilities and harness our existing assets. All together, they support our goal to grow comparable sales by 3% or more over time.

While growth is the most important part of the financial algorithm, sustainability of earnings is next. So in addition to evaluating our growth initiatives, I've worked with the team to understand the drivers and sensitivities of our operating margin. And I've really gained an appreciation for the resilience of our business.

Those of you who have been following Target for a longer period of time already know operating margin rates in our US business have been amazingly consistent over time. I've spent a fair amount of time in retail, so I am well aware of the challenge of maintaining profit margins in an incredibly competitive space. But Target has a proven model supported by a team that continues to innovate, offset challenges with opportunities, evolve with our guests' changing behaviors and leverage our assets in new ways, all the while supporting our Expect More Pay Less brand promise.

In 2015, the team made a lot of progress on the $2 billion cost-savings goal that Brian and John first laid out last year. These savings create the capacity to invest resources that support growth initiatives and deliver on our longer-term financial goals. As we enter 2016, we are on track to meet or exceed that $2 billion savings goal by the end of the year and we believe we have more opportunity ahead of us.

For example, we invest a lot in promotions to provide compelling value to our guests, billions of dollars annually. As I mentioned last week on our earnings call, I believe we have an opportunity to enhance their effectiveness, especially in the fourth quarter. As a result, we are taking a comprehensive look at last year's promotional activity and I'm confident we will be able to find additional savings we can reinvest into the business.

Now let's turn to capital deployment, beginning with our long-standing priorities. First, we always invest in the business on projects that meet our strategic and financial criteria. Second, we support the dividend and plan to build on Target's legacy. We've paid a dividend every quarter since we went public in 1967 and increased that dividend every year since 1971. Finally, we used share repurchase to return the excess cash beyond what's necessary to support those first two priorities within the limits of our A credit rating.

So now we can combine all of the plans we've discussed today into a longer-term financial algorithm for Target and for those of you who were here last year or saw this presentation, this should look pretty familiar. We expect to grow our comparable sales 3% or more annually in 2017 and beyond. While new flex format stores should contribute additional sales, the lion's share of our growth is expected to come from existing assets.

Over time, we are planning to maintain EBITDA margin rates in a range around our expected 2016 rate of 10.5% plus or minus. This reflects recent trends adjusted for the sale of our pharmacy business. Within the drivers of EBITDA, we are expecting annual gross margin rates in a range around 30% and SG&A in a range of 19.5%. These rates are broadly consistent with 2015 performance adjusted for our pharmacy sale.

Beginning in 2017, we expect some leverage on the depreciation and amortization line, providing about 5 to 10 basis points a year given our sales growth and capital plans. We expect to invest $2 billion to $2.5 billion in capital expenditures per year, focused on technology, supply chain investments to modernize our operations and to support flexible fulfillment. We expect to grow dividend 5% to 10% annually with a goal of moving to a 40% payout over time. And we expect to return $3 billion annually to our shareholders through share repurchase within the limits of our current A credit rating.

All of this means we will deliver an annual adjusted earnings-per-share growth of about 10%. About half of this growth will come from our earnings with the other half coming from share count reductions. And of course, when you consider the dividend yield on top of our EPS growth, we are positioned to deliver a total return of well over 10% annually.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



THOMSON REUTERS

And finally, John told you last year that our financial algorithm is designed to deliver after-tax return on invested capital in the mid-teens or higher in the next five years. Last year, excluding the gain from the pharmacy sale, this metric was already a very healthy 13.9% and if we meet our goals over the next several years, we will be well-positioned to deliver one of the highest after-tax return on invested capitals in retail.

Now if you are like me, you focus most of your time thinking about the long term, but I know you have a job to do and I promised last week I would give you a little bit more detail into our 2016 financial plan. Beginning with comparable sales, we expect to grow 1.5% to 2.5% in 2016, which is prudent given the current environment. Of course, because of the sale of our pharmacy business, total sales are expected to be down 3% to 4% in 2016.

On those sales, we expect our 2016 EBITDA margin rate will increase meaningfully from last year, reaching approximately 10.5% this year. This reflects a small increase in our underlying profitability combined with the benefit of the pharmacy sale. And it's expected to be entirely driven by an increase in our gross margin rate due to the removal of the pharmacy sales.

On the SG&A line, we are expecting a slight increase in the rate this year reflecting intentional investments in our team. These intentional investments include things like the digital merchants that Brian mentioned earlier, as well as investments in headquarters talent and technology and data science areas. Also, expense this year will include the cost of reissuing our chip and pin REDcards to our guests.

I want to add that both our gross margin and our SG&A expense rates will benefit from the cost savings I described earlier. These savings will allow us to continue to invest this year in product quality, store service and headquarters talent and maintain our EBITDA rate performance in line with our historical results.

Moving to consolidated metrics, our 2016 interest expense in dollars is expected to be about flat to last year and we expect our effective income tax rate to be between 35% and 36% for the full year.

Regarding capital deployment, we are planning to spend about $1.8 billion in CapEx this year and I'm confident we are investing in the right things with the right amount. Namely, we are investing in technology and our entire supply chain to modernize our operations, enhance the guest experience and build the foundation for Target's future growth. We will recommend to the Board a 5% to 10% increase in our quarterly dividend this year and we are planning to invest about $3.5 billion or more in share repurchase in 2016. This is higher than our longer-term capacity in light of our year-end cash position.

Combining all of these metrics, we expect to generate full-year adjusted earnings per share of $5.20 to $5.40. This EPS growth is a little higher than our longer-term financial plan, reflecting the expected share repurchase benefit of the cash from the sale of our pharmacy business.

Today, you've heard a lot about our business and how our strategic priorities remain consistent. You've also heard a lot of detail to support how we will continue to deliver healthy top-line growth and healthy shareholder returns. But what I hope you've heard most today is the voice of our guests. Our goal is to have our guests fall in love with Target all over again every time they shop.

I recently had the opportunity to sit with a guest in her home for several hours. It was so great to hear how many times Target has made her life easier from ordering online and picking up in-store to delivering a wonderful holiday experience for her family. Without knowing where I worked, she quickly blurted out I love Target. I know I will never get tired of hearing that. With that, I will invite Brian and John back up to the stage and we will take your questions. Thank you.

## QUESTIONS AND ANSWERS

**John Hulbert** - *Target Corporation - VP, IR*

Thanks, Cathy; thanks, John.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



THOMSON REUTERS

**Oliver Chen** - *Cowen and Company - Analyst*

Oliver Chen, Cowen and Company. Regarding the loyalty program and the opportunity for personalization, could you just speak to what you see as the next opportunity in loyalty? And related as we think about Target for the long term and investors think about long-term Target, what would you say are your real competitive advantages as Amazon really seeks to also try to be very competitive in consumables and apparel?

**Brian Cornell** - *Target Corporation - Chairman & CEO*

Oliver, I'm going to start and we are fortunate enough to have Jeff Jones sitting right up front, so I'm going to turn it over to Jeff. But as Jeff looks for a mic, one of the things that we are clearly looking at, and I talked about it from the stage, is the fact that we think we have an opportunity to bring integration into our current programs. We've got a number of different vehicles out there today and an overall theme you've heard from our team is simplification. How do we make sure it's really simple, but how do we really build a different relationship with our guest? And the nature of that, they are not just loyal to us, but they recognize we are loyal to them. So with that, let me turn it over to Jeff.

**Jeff Jones** - *Target Corporation - EVP & CMO*

So you've heard so much about Cartwheel and REDcard. Those are two really important programs that work in different ways, but allow us to identify a large number of transactions. What you haven't heard a lot about is the pilot of REDperks, which we completed in Raleigh-Durham. So REDperks was an idea, which was what's the value of a non-tender loyalty rewards program in the Target ecosystem and we are really, really pleased with what we saw with REDperks.

So what you will see us do as we move into this year is to simplify and integrate those programs and so the power of non-tender rewards points, the power of 5% savings every day, personalized discounts with Cartwheel in a simple, single sign-on, one barcode checkout kind of program all on the mobile device.

And the key to personalization for us has to start with identifying a substantially larger number of guests than we do today. So the more we have our guests opt into a program like this that I'm speaking about, the more we learn about their attitudes, their preferences and their behaviors, the more we can really identify them, deliver individual value to them and start investing more of the markdowns that Cathy mentioned in the guests that matter most based on lifetime value.

So that's the shift that you will see us make based on two really successful programs in Cartwheel and REDcard and what we've seen with the power of non-tender loyalty in REDperks.

**Brian Cornell** - *Target Corporation - Chairman & CEO*

Thanks, Jeff.

**Robbie Ohmes** - *Bank of America Merrill Lynch - Analyst*

Robbie Ohmes, Bank of America Merrill Lynch. My question is on localization. It's something that has been talked about in the past by Target over the years and never has really happened. And Mr. Mulligan, I think -- I don't want to misquote you -- but I think something like you said 93% of the items in a Target store are in every Target store, I think in the past something to that effect. So the same assortment everywhere.

I look at all the initiatives you guys are doing. They sound great, but what has changed that will allow Target to be more local and why should we not worry that all these initiatives will play out and there won't be risk to you maintaining that 10.5% EBITDA margin?

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

 THOMSON REUTERS

**Brian Cornell** - *Target Corporation - Chairman & CEO*

John, do you want to talk about the work on localization?

---

**John Mulligan** - *Target Corporation - EVP & COO*

Yes. On localization, I think you are right. We've done some in fits and starts and we saw this in Chicago last year. We were able to maintain it, but it is duct tape, baling wire and a lot of heavy lifting because we don't have great process technology sitting behind it and the supply chain to support it.

So the difference is now we are working on the process, the technology and the supply chain to support it and it's one of the reasons we've slowed down on localization. We are not ruling it out everywhere. We've said, okay, we tested it, we certainly like the results, outstanding results, but we don't have the ability to roll this out everywhere and be successful.

So we are working right now on the back-end technology that will allow us to build planograms that are localized for every single store. There's a store element where we need the right team members in there who can help us identify what the right products are and how we get that information back to headquarters and get the right product flowing through our supply chain and then a supply chain that's capable of dealing with an enterprise assortment but getting the right SKUs to the right part of the country at the right time. And so those are capabilities we are working on building that we are in the process of right now.

---

**Brian Cornell** - *Target Corporation - Chairman & CEO*

The only thing that I would also add, and John has talked about the fact that we certainly tested this in Chicago. We are going to continue to test this in the LA25 stores and we've seen the results. But as we think about localization, we are not talking about changing tens of thousands of items. In many cases, we are changing 3000 or 4000 items that make us much more relevant in the local market, but we've got to make sure we can do that 18,000 times -- or 1800 times.

So to do that, we've got to have the right back-end technology. We've got to have the right processes and systems in place, but we know through the testing we get a very powerful lift in comps. We get greater engagement with the guests because they recognize we've got the right local assortment and sometimes it's not what we add, it's what we take away. It's making sure that in Phoenix, Arizona or Miami, Florida, we are not sending them hats and scarves and gloves. So it's also taking certain things out to make sure we are locally relevant.

But with each one of these initiatives, we are carefully testing, we are validating the results to make sure that we are getting the right return on that investment. But to do this right, to do it at scale, to do it 1800 times, we've got to have the right back-end processes, we've got to have the right data science behind the choices we make and we have to be able to make sure we can do it on a consistent basis. So we see significant upside and as we build those capabilities, you will continue to see that expand into local markets.

---

**Michael Lasser** - *UBS - Analyst*

It's Michael Lasser from UBS. My question is on your longer-term guidance of 3% comp growth and maintaining the 10.5% EBITDA margin. Hopefully you can describe some of the factors that are going to allow you to maintain that level of profitability in a world where there is clear and obvious pressures on your margins over time given the price transparency of the retail landscape, the fact that you are now shouldering the burden of costs that historically have been borne by the consumer like in-store fulfillment, rising wages and the fact that your cost savings are going to reach your goal by the end of this year. So what are the factors that are going to drive your ability to sustain this 10.5% operating margin?

---

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

THOMSON REUTERS

**MARCH 02, 2016 / 7:30PM, TGT – 2016 Target Financial Community Meeting**

**Brian Cornell** - *Target Corporation - Chairman & CEO*

So let me try to toggle through the P&L and walk through different opportunities that we think are still certainly in front of us and we've talked about localization. We think there are significant opportunities to make sure that, as we localize, we are building the right assortment that certainly contributes to greater acceleration in our comps and supports that 3%.

As we continue to see the guests respond to the changes we are making in signature categories, those categories like apparel and home and beauty, baby and kids, those happen to be some of the highest gross margin rate categories in our store. So gross margin rate will continue to help fuel our performance going forward.

While we are very pleased with the performance that we've seen in 2015 and our outlook in 2016 from a cost-savings standpoint, we continue to identify future opportunities. Cathy talked about our promotional ecosystem where today we spend billions of dollars each year. We think we have an opportunity to continue to enhance and refine the effectiveness.

John has talked about the work from a supply chain standpoint. As a byproduct of that, we think we are going to drive greater efficiency and whether it's reducing working capital as we reduce back-room inventory or flow product more effectively from our trucks to our shelves, we are still in the early stages of capturing some of that savings.

So we've had a number of variables in play, but we are confident that, with the priorities we have in place, we are going to continue to deliver very strong performance and maintain both the comp store growth rates and the strong returns we are seeing today.

---

**Paul Trussell** - *Deutsche Bank - Analyst*

Paul Trussell from Deutsche Bank. Very much respect your decision to invest in growth, lots of exciting projects that you have on deck here at Target. But can you discuss in a little bit more detail the LA25 initiative and broadly help us understand the cadence of the ramp in labor in the store for both the purpose of improving service, as well as the purpose of supporting a supply chain focus and the food initiatives that you all discussed?

---

**Brian Cornell** - *Target Corporation - Chairman & CEO*

Let me further describe where we are today with LA25 and I might have Jeff provide some additional insight and color. First of all, we haven't opened up one of our LA25 stores yet. It is clearly under construction and we expect to complete many of those changes early on this summer. So think about the May and June and July period. It'll be our first chance to understand how the guest reacts when we bring all of these different tests that on their own have been very well-received by our guests together in one centralized location.

So we are going to use that as a very important test ground for our brand. We will test a number of new initiatives there, as I described today and we will decide what are the initiatives that work best for the guests, that drive the right results for us from both a top-line growth standpoint, but also drive greater satisfaction from our guests every time they shop.

So we are in the early stages of testing that. We are going to learn over the next few months and as we learn, we are going to decide what we bring to the balance of our system. Jeff, do you want to provide additional color on LA25?

---

**Jeff Jones** - *Target Corporation - EVP & CMO*

I'm not sure how much more to add. That was very well said. I think the big point is it's an integrated approach to all the tests we've been doing individually. So a lot of great success in individual things around the country, but it's the first look at bringing them all together in one store with a very important guest in a state that matters a lot to the Company. So more to come as we complete the test.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.


THOMSON REUTERS

MARCH 02, 2016 / 7:30PM, TGT - 2016 Target Financial Community Meeting

**Brian Cornell** - *Target Corporation - Chairman & CEO*

Sure. And I think embedded in your question was a question about the investments we are making in visual merchandising. And if you were to ask John or ask Cathy if we think about investments we've made in the last year, one of the investments that's providing absolutely the best return is the additional focus we've placed on merchandising in our stores and the experts we now have merchandising our apparel, our home, those key vignettes throughout the store. And we are seeing the payback in guests that are clearly responding to our apparel offer in many cases like they haven't in years.

And in 2015, we saw very strong apparel performance and we are proud to say that we grew marketshare throughout the year, including in the fourth quarter. We talked about home and the home performance not only in the fourth quarter, but throughout the year in 2015. Comps up 4%, the strongest performance we've seen in a decade and so much of that is driven by an improved in-store presentation. The fact that we are now taking some of the fabulous product that Julie and her team are designing, the product that we are sourcing for our guests, we are now presenting it in a much more impactful way and the guest is responding and we are seeing those comps grow in categories that are clearly margin-accretive for Target.

So we are seeing the guests respond to the investments we've made in apparel, in home and we talked about one of the highlights in our fourth quarter was the change we made when we reimagined One Spot, the first thing you see when you walk into our stores, and created what we now refer to as Bullseye's Playground. Bringing our mascot into that initial area that you see when you walk into the store, reimagining that for our guests and we saw comps up over 25%. And I think we can say today we are seeing that moment continue as we go into the first quarter. And our visual merchants, our visual merchandising leaders in store, play a very important role in that very big, highly profitable Bullseye's Playground.

So we think those are the right investments. We monitor everything very carefully, but the investments in store labor and in visual merchandising are driving comp increases in those important style categories like apparel and home and clearly are driving unique growth rates in the front of our store with Bullseye's Playground. So we are confident that we are getting the right return, but we will watch that very carefully throughout the year.

**Daniel Fu** - *Maplelane Capital - Analyst*

Daniel Fu. I had a question on gross margins. You are basically guiding 30% longer term. Last year, you broke out that in-store gross margins were about 29.5%; online, you said, about 23.5%, 600 bps spread. So if longer term are you basically guiding that online and store margins may go up, or are you saying that store margins may go up above 30% and then online will be less of a drag, which is about 3.4% of sales and today you are not commenting on digital growth, but are you basically guiding in-store margins higher over time because of signature and home?

**Cathy Smith** - *Target Corporation - EVP & CFO*

Yes, so let me help a little bit there. So the first thing that we've learned or one thing that we've learned that's become very clear this year is our guest doesn't see a difference between the channels. And so if an order is placed online, but picked up in store, is a digital sale or a store sale. So we start there with thinking about literally a one Target experience.

With regards to margins, so the biggest challenge with just a peer fulfilled online order is the shipping piece, as you know. As we use our stores more and more for flexible fulfillment, we are helping to offset that, as well as when we have a guest in our stores, often times, they actually take the opportunity to shop some additional things in the store. So the combination of that shift is helping with a little bit of that, what was once thought of as just a pure drag on margin with a shipping expense.

In addition, as we continue to see our digital or our dotcom business pick up across the entire Target offering, we are seeing more and more of those signature categories as well, so that helps with the margin too. So in aggregate, we see a 30% margin as we suggested in gross margin and we really do see it as a single Target experience.

21

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



**Brian Cornell** - *Target Corporation - Chairman & CEO*

And again, in the short term, our gross margin rate in 2016 will benefit from the sale of our pharmacy assets.

**Dan Binder** - *Jefferies & Co. - Analyst*

Dan Binder at Jefferies. I just wanted to talk about food for a little bit. Obviously, the industry has some stores that are more convenient than yours, some stores that have greater assortments and many are doing organic and wellness already. And I realize that these initiatives may be incremental to you and help lift sales, but it seems like longer term to really drive traffic, you would need to expand the fresh areas of the store, including meat, produce, bakery, deli, etc. And I'm just curious your thoughts on why you wouldn't do that and shrink some of the less productive parts of the store or those that may eventually be going away over time like physical media? Thank you.

**Brian Cornell** - *Target Corporation - Chairman & CEO*

On an annual basis, we regularly sit down and look at how we purpose space throughout our store and that's a conversation we are going to continue to have. But as we sit here today, and we are clearly focused on making sure we lead with those signature categories that are really going to define and differentiate our brand going forward.

So as we think about space expansion and we think about the future layout of the store, we've got to start with making sure we properly position our style categories, apparel, home and beauty. We are investing in spaces like baby and kids. We are enhancing wellness and considering what the right footprint should be for food.

So we want to make sure that as our guests come to Target, we provide them a convenient, trusted, reliable experience when they shop our food department and recognize that a lot of that traffic is going to be generated by the fact that they've come to us because they've started their Target run. There's core family essentials that are driving them to our store. They are spending the time discovering and searching through many of our signature categories and while they are there, we want to offer them a convenient, trusted, reliable assortment of products in food. Sitting here today, we think that's the winning formula for Target going forward over the next few years.

**Matt Nemer** - *Wells Fargo Securities - Analyst*

Matt Nemer from Wells Fargo. Thank you. As you think about broadening and simplifying the loyalty program, is there any potential to have a buy-in membership program where you might offer not only something like free shipping, but an array of other services to increase wallet share with your guests? Thanks.

**Brian Cornell** - *Target Corporation - Chairman & CEO*

Jeff, do you want to give him a sneak peek?

**Jeff Jones** - *Target Corporation - EVP & CMO*

I think the simple answer is we have to consider both the high end buy-in and getting more people to enroll in non-tender. And so right now given the success of REDperks, we think the biggest opportunity to scale the number of guests we can identify is by thinking about how to simplify and integrate Cartwheel and REDperks and that's definitely step number one.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

 THOMSON REUTERS

**Matt Fassler** - *Goldman Sachs - Analyst*

Matt Fassler from Goldman Sachs. So over the past year, you have cut, I guess, so year two, $1.5 billion of SG&A. You said you will be there by the end of the year. That's a lot to cut, but it's also a lot to redeploy. It sounds like the redeployment is coming essentially at the same pace as the dollars are coming out. So can you talk about the pace of that cost take-out and really where we are seeing those dollars show up in your spending plan?

**Cathy Smith** - *Target Corporation - EVP & CFO*

I'm happy to start there. So we did lay out a plan a year ago for $2 billion of cost-savings, an opportunity that John and Brian laid out. We did achieve a lot of that. The SG&A piece of that, a lot of it started in last year in 2015 so we will get the benefit of that run rate savings coming into this year and it was a lot of things. It was around making more efficient organizations, but it was also just inefficiency in our business and the team has done a great job there.

About $500 million of it was in cost of goods sold, so that's going to show up as we think about sitting down with our vendors and having a stronger partnership relationship there, thinking about how we source things. All of that's been coming through -- both of those will be -- throughout 2016, we will be able to declare victory on that $2 billion in savings.

And to your question about where is it showing back up in, you are absolutely right, it's a delicate balance between making sure that we are taking out efficiency or things that aren't as important and making sure we are investing in things that we absolutely want to stand for. And so that's what the team has been doing brilliantly through last year and into this year is figuring out where do we want to invest, whether it's in product quality or in data scientists and we are doing -- it's pretty much across the board there.

**Brian Cornell** - *Target Corporation - Chairman & CEO*

Cathy, I think one thing that might be helpful for this group to understand is some of the changes that Mike McNamara has made in his department. If we can get Mike a microphone, I think it would be helpful for him to provide a perspective.

I will tell you one of the great things that Mike has brought to us is a very objective approach, but a very knowledgeable approach to how to lead the business. And one of the first thinks Mike did probably 90 days into his role is come to me and say, Brian, one, I think I have too many outside contractors. I think I can do this much more efficiently if I build engineering talent within. I think we are working on far too many projects. I think we can set much tighter priorities and deliver stronger results and impact the business more effectively.

And for the first time perhaps in my career, I had someone walk into my office and say, Brian, I've got too much capital to spend. I can actually deliver this much more efficiently; I want to give you some dollars back. And that's certainly fueling some of the changes we've made and that you are seeing in our algorithm going forward.

So Mike, why don't we give you a chance to introduce you to the group? Mike is sitting right up front. And why don't you offer a perspective on what you've seen and the approach we are taking as we go into 2016 from a technology standpoint?

**Mike McNamara** - *Target Corporation - EVP & CIO*

Good afternoon. So I've been in the business about eight months. I joined in June of last year. As the guys introduced, I came from Tesco. I guess my perspective is this is that people have asked are we spending enough money on technology and we are spending [pots] of money on technology. We are spending definitely enough money on technology. And it really is about actually where is our fit and focus.

So my first outing with the Board happened probably about two or three months in and I explained to them what I wanted to do and they said to me, well, what do you need and I said, well, what I need is less money and fewer people, which I think took them aback a little bit. Because in reality

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.


THOMSON REUTERS

**MARCH 02, 2016 / 7:30PM, TGT - 2016 Target Financial Community Meeting**

we had -- last year, we were doing 880 projects simultaneously. Now we've got lots of good ideas about where to invest our technology dollars, but I assure you that we don't have 880 great ideas running simultaneously.

So this year, what we are trying to do is we are taking actually -- we are spending less money. We are spending it more internally, less on third parties and we are going to focus in on fewer than 100 projects. So from 880 projects down to fewer than 100. And those 100 projects are far more focused in on what John and Cathy and Brian have been talking about, so the money is going to go on the supply chain, it's going to go on e-commerce, it's going to go on guest loyalty and it's going to go on store productivity, store operations.

So the approach really has been about actually focusing our investment on the strategic initiatives rather than spending on a slew of initiatives that may not make a great long-term impact on the business. So we will spend less, be far more focused, bigger in-house team, less reliance on third parties.

---

**Chris Horvers** - *JPMorganChase - Analyst*

Chris Horvers, JPMorgan. So you are expecting same-store sales to accelerate in 2017 3% plus and actually it's a little bit better than what you guided to last year, so it's a step up. Over the past year, your execution has been much stronger as a company. You also have had a pretty favorable macro backdrop, at least relative to where it's come from with salary and wage growth at the low end, lower gas prices. So can you talk about what drives the confidence in getting to that 3% plus and perhaps put some weighting around what initiatives you think are going to be the most impactful to drive that acceleration?

---

**Brian Cornell** - *Target Corporation - Chairman & CEO*

Hopefully, for most in the room, my answer is not going to surprise you. I think it's the exact same initiatives we've been talking about for the last two years. But, over time, those initiatives are going to mature and we are going to expand them to a broader base of our assets. So we expect to continue to see our signature categories outperform our overall comps.

And as we continue to see great new brands like Pillowfort come to market to support the growth in our kids business or CAT & JACK fuel accelerated growth in baby, continue to mature our offerings in wellness, continue to invest and bring great design and quality and innovation to apparel and home, we think that's going to only get better over time. And those are longer leadtime categories, so we will see some of that certainly in 2016. We will be seeing more in 2017 and 2018.

We have already talked several times about localization. Today, we are doing it in a handful of stores. We would certainly expect, based on the work that Mike and his team are doing, John and his team are doing, that as we get into 2017 and beyond, we will be localizing more and more of our stores around the country.

We certainly expect to continue to build our digital capabilities and make it even easier going forward for our guests to shop at Target no matter how they want to interact with the brand, either in our stores, clicking and coming by to collect or having product delivered to their home. So those capabilities are only going to mature over time.

We are very excited about the reaction we've seen with our smaller flexible format. We are opening up a handful of additional locations in 2016, but we are building a very strong pipeline in 2017 and 2018 and beyond. So it's those core initiatives that are going to accelerate our growth in 2017, 2018 and 2019 fueled by the commitment to having the right retail fundamentals, to having a loyalty program that builds even greater engagement with our guests. And while we like the progress we are seeing, and we expect more of it in 2016, those capabilities and initiatives are only going to mature in the years to come and we think that's going to continue to drive our overall Company performance.

---

24

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



**MARCH 02, 2016 / 7:30PM, TGT - 2016 Target Financial Community Meeting**

**John Zolidis** - *Buckingham Research - Analyst*

John Zolidis, Buckingham Research. So when you came in, they very quickly decided to exit the Canada foray given the unlikelihood of getting adequate returns and then not that long after the sale of the pharmacy business, which is also having a very strong impact on return on invested capital and margins. So as you look at the business now, are there any other bold stroke decisive type moves that you are considering that could potentially also have some kind of a positive improvement on the overall Company's return on invested capital that perhaps we can look forward to hearing about in the future?

---

**Brian Cornell** - *Target Corporation - Chairman & CEO*

I think it's how we define bold and I think some of the changes we've already talked about today are very bold steps for us. The approach that Mike just laid out from a technology standpoint is a very different path than we've been on in the past. The approach that John and the team are taking to retail fundamentals, to improving supply chain in-store processes and operations for us are very important and very bold steps.

Today, we introduce two exciting new brands. Those we expect to be $1 billion brands going forward. For me, those are pretty bold choices and steps that we are really excited about. Jeff has talked about the commitment we have to building a very different approach to loyalty. Those are bold commitments for us. And when we start adding them up, those are the elements that start to transform our Company and continue to bolster the brand.

So there may not be the changes that you talked about, the one-time events like Canada and the transaction with CVS, but we think these are the right initiatives for the Company. We think they are bold choices. We are doubling down behind each and every one of them and fundamentally, we think those are the right steps for our guests, the right steps for our business and certainly the right things for our shareholders. And over time, they are going to deliver very strong returns and results for the Company.

So we actually as a leadership team think those are very important and very bold choices and we are not talking about 100 initiatives. We are talking about a very focused and finite group of initiatives that we think when we bring them together will redefine our Company for years to come. Thank you.

---

**Bob Drbul** - *Nomura Securities - Analyst*

Bob Drbul from Nomura Securities. Two questions. The first one is I think last year you laid out a clear plan of 40% digital sales growth. Is there a plan that you can share with us in terms of the next few years on that segment within your sales plan? And the second one is that CapEx was I think $1.4 billion or $1.8 billion, below the $2 billion. The plan is going from $2 billion to $2.5 billion. Is that all supply chain investment increases because the Amazon guys, they like to spend money, so I'm just curious how you think about that?

---

**Brian Cornell** - *Target Corporation - Chairman & CEO*

Let me talk about capital and then go to digital and as you think about our capital spending in 2016 and going forward, we will be spending behind technology. We will be spending behind supply chain. We are reinvesting and remodeling our stores and we are going to have ongoing maintenance and repair work. So those buckets are going to stay fairly constant and obviously, as we continue to perfect and refine our flex format, you should see us expand our investment there, but we think those are the key areas that are going to underpin the Company going forward.

From a digital standpoint, if we go back a year ago when we talked about our expectations, we said we wanted to be in a position where we were industry-leading. We wanted to make sure we had a very bold objective not only for our investment community, but importantly for our own team, to make sure everyone realized how committed we were to digital.

And if we go back to what Cathy has talked about today, what John has talked about today, what Carolyn talked about in the video, in every one of those guest immersions, whether we've been sitting in San Francisco or Boston, Dallas or Chicago, different parts of the country, we clearly

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.


THOMSON REUTERS

recognize that our Target guests, in fact, today's modern shopper, they are absolutely digitally-enabled and that enables them, whether they are coming to one of our stores, looking to click or collect or looking for product to be conveniently delivered to their home.

So we are absolutely committed to driving accelerated growth from a digital channel standpoint, but as opposed to putting a number out there, we said we just want to make sure we are in an industry-leading position and we want to make it really easy for our guests to decide just how they want to shop with us. But as Cathy mentioned, we realized it's really hard to keep score. A significant portion of our digital growth in the fourth quarter where we grew 36% was a guest who shopped online and then conveniently came to our store to pick up their order. And while they were there, they continued to shop other categories.

A significant portion of our digital growth in the fourth quarter was store-enabled, those over 450 locations that are delivering the last mile, that are partnering with an outside vendor after we pick, pack and ready the product. Is that an online order? Is it a store order? It all ends up being a way that Target fulfills the needs of our guests. But we are more committed than ever to the importance of ensuring our business is digitally-enabled, that we have the right tools and capability, that we make it really easy and to quote many members of our team, we just want to make sure it works.

So we are going to continue to focus on driving strong digital performance. We will report it every quarter. We just don't think today we have a line of sight to saying here is how we are going to forecast it. But we certainly want to be leading the industry as we go forward and continuing to make sure we deliver the right experience for our guests.

---

**Unidentified Company Representative**

We have time for one last question.

---

**Wayne Hood** - *BMO Capital Markets - Analyst*

Wayne Hood, BMO. So I had a question for you, Brian, and one for you, John, as a follow-up. If the customer work you are doing around grocery points to a path where they say to you we would like you to see -- we would like you to offer fresh cut meat, fresh fish, those more labor-intensive businesses that you haven't offered in the past, would you be willing to go down that path? And if you were, how much of a lower EBITDA margin would you be willing to accept?

And then, John, maybe related to all of this, as you think about food 5, 10 years out, that you look at your fulfillment on the fresh side, can you really get it accomplished with produce without localized distribution centers getting away from third party and if you do so, does that mean that in five years we are looking at a stepup in capital spend, get your food assortment localized fresh, get away from third party?

---

**Brian Cornell** - *Target Corporation - Chairman & CEO*

John, do you want to start and I will finish off?

---

**John Mulligan** - *Target Corporation - EVP & COO*

Well, a lot of speculation there in your question, Wayne. So I think the first thing for us is to get what we are doing right -- what we are doing today right for our guests. The fresh food we do have in our store needs to be fresh every day and it needs to be local every day. We've done a lot of work. We've brought in some experts to help us think about the fresh food supply chain. We are not ready to tell you what our plans are there, but we think there's an opportunity for us to improve that.

I think Cathy and I have talked about this several times and she has asked me that exact same question. Is there a bingo coming for capital investment around food? And I think everything we see today would lead us to believe that we feel really good about the capital plan we've put in front of you and that $2 billion to $2.5 billion I think is the range we put around it that we feel good we will operate within that for the foreseeable future.

26

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.


THOMSON REUTERS

**MARCH 02, 2016 / 7:30PM, TGT – 2016 Target Financial Community Meeting**

So we feel good about that, but I think our focus today is on getting what we do right -- do in the store today right for our guests. And that's what they expect from us today. If we learn more down the road, we will adjust, but really what they are looking for from us today is what we have, just do it well, do it the way Target should do it, what we've come to expect from Target.

**Brian Cornell** - *Target Corporation - Chairman & CEO*

Wayne, I think that's really the answer. We want to make sure that, in food, we are focused on getting the fundamentals right. We think we can differentiate through assortment. We've also got to be clear about who we are and who we are not and we are going to be true to the drivers of our strategy and how we differentiate the brand. So we are going to make sure that we have got the right fundamentals in place in food. We clearly recognize we have to improve freshness whether that's in a Super Target or a PFresh, but we are going to be really careful about moving into new spaces that add greater complexity to the business model.

So why don't I just take a couple of seconds to wrap up and I certainly appreciate the time that you've spent with us this afternoon. Hopefully, you recognize that our plan today is very consistent with the ambitious plan we laid out last year. And we've put together a multi-year plan designed to make sure we drive consistent, profitable growth and I want to underscore the point consistent.

As you look at our performance in 2015 and again in 2016, we are really focused on driving consistency. We've seen very positive comp store performance over the last five or six quarters. We are really pleased with the traffic we are driving and we certainly think we are making some big strides from a digital standpoint.

But, as we go forward, I hope you recognize that the plan that we have in place starts with the guest and that will clearly drive the choices we make. Hopefully, you walk away today recognizing that that plan will be supported by even stronger retail fundamentals in the future than we have today.

It'll be a business that will clearly be enabled digitally and it'll be led by our signature categories that we think define the brand and really define the essence of our brand promise. So we've got a very clear set of priorities. It starts with making sure each and every day we are thinking about the guest. We are thinking about how we serve the guest no matter how they shop and it's driving our performance.

So our team today is really proud of the progress we've made, but we recognize we have a lot more work to be done. So it's a very proud, but humble team. We know we've got a lot more work that has to be done. We feel like we are just getting started, but we think we've put together a plan, an algorithm that will guide this Company over the next few years and it's going to allow us to build off of these choices we've made to consistently drive profitable growth, improve our marketshare position, endear even greater loyalty with our guests and set the Company up for growth for years to come.

**DISCLAIMER**

Thomson Reuters reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON REUTERS OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2016, Thomson Reuters. All Rights Reserved.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



# EXHIBIT D

# Arthur L. Valdez, Jr.

3436 92nd Ave NE, Yarrow Point, WA, 98004 | 206-484-3270 | arthurv1313@gmail.com | www.linkedin.com/in/ArthurLValdezJr

**GLOBAL OPERATIONS EXECUTIVE** with 20+ years of experience in direct-to-consumer fulfillment, direct to store distribution for varying product lines, and leading international, cross-functional teams in large, matrixed organizations like Amazon and Wal-Mart. Brings expertise in developing strategy and operations design in North America, Europe, Asia and Latin America to both solve business problems and drive alignment of business initiatives. Fluent in English and Spanish.

## Qualifications & Skills

**Strategic Growth Planning** – Manage process, prioritization, and alignment of global initiatives. Introduce products and services into new markets. Build strategic partner relationships. Foster an assertive and results-oriented atmosphere.

**Global Operations Experience** – Apply strong business acumen to direct operational development. Collaborate to achieve revenue and margin targets. Manage the collection of actionable analytics to guide improvements. Establish productive relationships with stakeholders and executives.

**Distribution and Fulfillment** – Manage multiple order processing operations ranging in size from 200K sq. ft. to over 1M sq. ft. Oversee fully-automated, direct-to-store and consumer facilities. Enhance facility utilization through engineering design and process creation improvements.

**Supply Chain and Logistics** – Direct on-time inbound vendor management for inventory arrival, strategic inventory placement, inventory storage and throughput requirements, and cost reduction from order consolidation.

**Distribution and Transportation** – Deploy all facets of Linehaul, Backhaul, Sortation Center, Delivery Station, and Last Mile delivery capabilities for cost reduction, differentiation of services, and protection of capacity. Put in place processes for continued growth, fast speed of delivery, and improved customer convenience.

**Process Improvement** – Bring solid expertise in Six Sigma and Lean Kaizen. Analyze and evaluate business KPIs/success metrics and align with corporate requirements. Work with international suppliers in support of inventory strategies for supply chain and order fulfillment.

## Select Accomplishments

✓ In recent roles with Amazon, determine strategy for topology of operational locations, capital assessment, management requirements, engineering design, capacity management, financial management, and P&L oversight as it relates to entire Amazon operation. Apply background as a shop floor leader—running distribution centers, large groups, and complex internal processes—to seize significant and measurable returns in supply chain, systems innovation, fulfillment, and transportation.

✓ Utilized structured data analysis to understand root cause of problems with quality of inventory and process flows; instituted Six Sigma/Lean changes to daily execution and created a culture of continuous improvement. Subsequently saved $500MM+.

✓ Participated in strategic planning with other senior leaders at Amazon across multiple entities, including retail, IT, web services, supply chain, finance, and transportation. Helped develop Amazon's transportation capabilities to internalize sortation and last mile delivery of shipments, improving total operating cost and realizing growth across multiple BUs. Opened WW 150+ new fulfillment, sortation, and delivery centers over a 15-year span to support yearly revenue growth of 30%.

## Career Timeline

AMAZON.COM, Seattle, WA
**VP of Worldwide Amazon Logistics** – 12/2012 to Present; **VP of Transportation, Supply Chain North America** – 06/2012 to 12/2012; **VP of Operations U.K.** – 08/2009 to 06/2012; **North American VP of Fulfillment** – 12/2008 to 08/2009; **North American Regional Director of Fulfillment** – 01/2005 to 12/2008; **General Manager**, Campbellsville, KY Fulfillment Center – 08/2000 to 01/2005; **General Manager**, Coffeyville, KY Fulfillment Center – 09/1999 to 08/2000

KMART DISTRIBUTION AND LOGISTICS, Greensboro, NC
**Assistant General Manager** – 07/1998 to 09/1999

STAPLES OFFICE SUPER STORE, Hagerstown, MD
**Senior Operations Manager** – 12/1997 to 07/1998

BLOCKBUSTER VIDEO/MUSIC, Dallas, TX
**Distribution Center Operations Manager** – 05/1996 to 12/1997

WAL-MART DISTRIBUTION/MCLANE CO., Loveland, CO and Mexico City, MX
**Senior Operations Manager** – 05/1995 to 05/1996; **Distribution Center Operations Manager** – 01/1993 to 05/1995; **Area Manager** – 05/1992 to 01/1993

## Education & Certifications

COLORADO STATE UNIVERSITY, FT. COLLINS, CO – **B.S. in Production Operations Management**, 1992

CERTIFICATIONS – **Six Sigma Black Belt** Certification, Amazon.com, 2004; **Leaders of Leaders Series**, Amazon.com, 2008; **Operational Leadership School**, Wal-Mart, 1992